56 U.S. 367 (1853)
15 How. 367
THE EXECUTORS OF JOHN McDONOGH, DECEASED, AND OTHERS,
v.
MARY MURDOCH AND OTHERS, HEIRS OF JOHN McDONOGH, DECEASED.
Supreme Court of United States.

*377 It was argued by Mr. Brent, Mr. May, and Mr. Hunt, for the appellants, and by Mr. Benjamin and Mr. Johnson for the appellees.
*400 Mr. Justice CAMPBELL delivered the opinion of the court.
The appellees are the heirs at law of John McDonogh, a native of the State of Maryland, who died at McDonogh, near New Orleans, in the State of Louisiana, in 1850, leaving there a very large succession. In 1839, the decedent executed, at New Orleans, an olographic will for the disposal of the estate he might have at his death. This will is in a legal form, and has been admitted to probate in the District Court of New Orleans. It contains two particular legacies which are not contested, and a single legacy under a universal title. In this bequest the testator declares, "that for the more general diffusion of knowledge, and consequent well being of mankind," and "being convinced that he could make no disposition of those goods which the Most High had placed under his stewardship, as by means of which the poor will be instructed in wisdom and led into the path of holiness," "he gives, wills, and bequeathes all the rest, residue, and remainder of his estate, real and personal, present and future, as well that which was then his as that which he might acquire at any time before his death, and of which he might die possessed, (subject to certain annuities,) to the corporations of the cities of New Orleans and Baltimore forever, one half to each," "to and for the several intents and purposes thereafter declared." The testator directs his executors to convert his personal estate into real property, whereby "the whole of his estate will become a permanent fund in real estate, affording rents, no part of which shall ever be touched, divided, sold, or alienated, but shall forever remain together as one estate, and be managed" as he shall order.
For the management of this estate, thus declared to be inalienable, he directs the two cities each to select, annually, three agents, whose duty it should be to receive seisin and possession of the estate from his executors, immediately after his death. They are "to lease or rent the lots," "cultivate the plantations," "collect the rents," "pay the annuities," "invest the moneys," and, "in fine, do all acts necessary to its full and perfect management, according to the will;" the will of the testator being "that no part of the general estate, or revenue from rents arising from said general estate, shall go into the hands of the corporate authorities of the said cities, but that the said authorities should have forever the supervision of it."
The testator designed the joint management of the agents of the cities, and the joint supervision of their authorities over the estate, to be perpetual. He forbids the cities to vary, by agreement, or by any compromise, the relations he has established between them in regard to it. They must make no sale of their interests; no traffic with their powers of control; no surrender, *401 for money or other consideration, of their supervisory care. But should they combine to violate his scheme of management or appropriation, their rights are declared forfeited, and "the general estate" is limited over to the States of Louisiana and Maryland, "for the purpose of educating the poor of those States," "under such a general system of education as their legislatures should appoint." He further provides, that should there be "a lapse of the legacies from the failure of the legatees to accept, or any other cause or means whatsoever," the shares should inure for the benefit of the State or States in which the cities are situate; "that the legislatures of those States respectively may carry his intentions, as expressed and set forth in the will, into effect, as far and in the manner which will appear to them most proper."
The testator having provided for the perpetuity of the McDonogh estate, and the destination of its revenues, proceeds to develop a minute and detailed scheme for its management, improvement, and the expenditure of its income. He appropriates one eighth part of its annual revenue, for forty years, for colonizing the free people of color, to the American Colonization Society, the sum not to exceed $25,000 per annum; one eighth part for the erection, in New Orleans, of an asylum for the poor of all ages, castes, and colors; one eighth part to an incorporated society for the relief of orphan boys in New Orleans; and one eighth part for the establishment of a school farm in Maryland. The money appropriated to the asylum, school farm, and orphan boys, he requires to be invested as capital in real estate, and the rents only to be subject to the uses of the donees. The capital of the asylum and school farm is to be entirely collected, before any appropriation takes place for their use; and for the one the capital is to be $3,000,000, and for the other $600,000. The remaining four eighths of the income of the general estate, for the present, and the whole, after the objects above mentioned are fulfilled, are destined "for the education of the poor, without the cost of a cent to them, in the cities of New Orleans and Baltimore, and their respective suburbs, in such a manner that every poor child and youth, of every color, in those places, may receive a common English education  based, however, be it particularly understood, on a moral and religious one;" the whole of the general estate "to form a fund in real estate which shall never be sold or alienated, but be held and remain forever sacred."
To carry his purposes into effect, he directs the selection of boards of managers for the different establishments, and suggests that acts of incorporation may become necessary to facilitate their operations.
*402 The appellees claim that, as to the property embraced in this bequest to the cities, that John McDonogh died intestate.
Their argument is, that although he makes in the commencement of his will a formal gift to the cities; although the cities are designated as his legatees in several clauses of the will, in precise terms; although the property is described as property "willed and bequeathed to the cities," that the testator has sedulously contrived to withdraw from them the seisin and possession of the whole estate, and has committed them to an uncertain and fluctuating board, for the selection of which he has provided; that the dominion and use of this property, in so far as he has permitted either, has been confided to this board of managers, but that this board is held servilely to a code of regulations he has dictated, the aim of which is to hold the "McDonogh estate" together in perpetuity; that by these restrictive regulations the donations to the cities have become nugatory and unavailing.
This conclusion was adopted by the Circuit Court, whose decree is under revisal, and has been sustained in the argument at the bar of this court with great power and ability.
We may remark of the will of the testator, that it indicates his imagination to have become greatly disturbed by a long and earnest contemplation of plans which he says "had actuated and filled his soul from early boyhood with a desire to acquire a fortune, and which then occupied his whole soul, desires, and affections." In the effort to accomplish these cherished hopes he has overstepped the limits which the laws have imposed upon the powers of ownership, overlooked the practical difficulties which surround the execution of complex arrangements for the administration of property, greatly exaggerated the value of his estate; and unfolded plans far beyond its resources to effect; and has forgotten that false calculations, mismanagement, or unfaithfulness might occur to postpone or prevent their attainment. Holding and declaring a firm faith in the interposition of Providence to render his enterprise successful, he apparently abandons himself, without apprehension or misgiving, to the contemplation of the "McDonoh estate," as existing through all time, without any waste or alienation, but improving and enlarging, "extending the blessings of education to the poor through every city, town, and hamlet" of the State where he was born, and the State in which he had lived and was to die; "rescuing from ignorance and idleness, vice and ignominy, millions upon millions of the destitute youth of the cities," and "serving to bind communities and States in the bonds of brotherly love and affection forever."
The exaggeration which is apparent in the scheme he projects, *403 and the ideas he expresses concerning it, afford the ground of the argument for the appellees. It is, however, unfair to look to the parts of the will which relate to the disorders which reign in society, or to his aspirations to furnish a relief for these "during all time," or to the prophetic visions awakened by the exalted and exciting ideas which dictated the conditions of the will, for the rule of its interpretation. We must look to the conveyances he has made in the instrument, the objects they are fitted to accomplish, and the agencies, if any, to be employed, and endeavor to frame these into a consistent and harmonious plan, accordant with his leading and controlling intentions. In reference to his controlling purpose there can be no mistake. He says, "that the first, principal, and chief object" in his view is "the education of the poor" of the two cities. With equal emphasis and precision he has disclaimed the desire of building the fortunes of his natural relations. He says, "that even to his children, if he had them, (as he has not,) and a fortune to leave behind him, he would, besides a virtuous education, to effect which nothing should be spared, bequeathe to each but a very small amount, merely to excite them to habits of industry and frugality, and no more."
His ruling purpose had no connection with the poor of any one generation. His desire was to establish a foundation to exist for all time  a perpetuity.
He knew that to attain this purpose a succession of persons, animated with a corresponding aim, must be obtained, and that the legal capacities of voluntary associations, even if he could hope to find such to enter into his plans, were wholly unfitted for his design; nor did he hope to effectually combine such persons by any power or prayer of his own. Hence, he selected as his devisees bodies corporate, endowed with the faculties of acquiring and holding property, having determinate ends and abiding agencies to be employed in accomplishing them. These were all requisite for the full attainment of the purposes he has declared.
He excludes, it is true, the municipal authorities from the particular management of the estate, or the application of its revenues.
But, the municipal officers are not his legatees. They are themselves but agents clothed with a temporary authority; nor do the officers perform their executive duties, except by the interposition of agents subordinate to their control and subject to their supervision. Had the testator confined himself to an unconditional donation of the general estate to the cities, for the use of public schools, it would scarcely have fallen under the personal management of the corporate authorities. They would *404 probably have appointed boards or agencies, to whom powers, more or less general, would have been confided, and over whose conduct their supervision would have been more or less particular and exact. The knowledge of this probably induced the testator to describe the board which his experience and observation had marked as the most efficient and responsible. He defines their number, the manner of their appointment, the form of their accounts, the modes of their business, and urgently exacts that the great, and to his eyes sacred, interests of his charity should not be blended with the vulgar and debauching concerns of daily corporate management. These directions must be regarded as subsidiary to the general objects of his will, and whether legal and practicable, or otherwise, can exert no influence over the question of its validity. Nor do we esteem the facts, that he has given his estate a name, regards it as a distinct entity, and couples with it language denoting perpetuity, important as evidence that the cities are not his legatees. A gift to a municipal corporation tends to create a perpetuity. Property thus held ceases to be the subject of donation, or of devise, of transfer by bankruptcy, or in the order of succession. The property of such a corporation is rarely the subject of sale, and practically it is out of commerce. McDonogh supposed that he could prohibit any alienation or division. We do not perceive, therefore, why he should have sought an incorporation of the general estate; nor do we understand that this forms a prominent portion of his scheme.
The will, through every part, discloses that the cities are the particular objects of his interest; and the poor of the cities of his providence and bounty. His will designates the cities, by their corporate name, as his legatees, in definite and legal language. His plan of administration is to be executed through agents, selected by their corporate authorities, and to the end of conveying to the poor of the cities, perpetually, the fruits of his property. We should violate authoritative rules of legal interpretation, were we to disinherit the cities under these circumstances, and to substitute for them "an ideal being" called the "general estate," having no legal capacity, nor juridical character, and whose recognition, therefore, could have no result but to overturn the will of the testator. C.C. 1706; 1 Spence, Eq. J. 529, 530; 5 Ann. R. 557.
Having thus determined that the legacy is to the cities by a universal title, and, having extracted from the will the leading and controlling intention of the testator, the next inquiry is, whether a legacy given for such objects is valid.
The Roman jurisprudence, upon which that of Louisiana is founded, seems originally to have denied to cities a capacity to *405 inherit, or even to take by donation or legacy. They were treated as composed of uncertain persons, who could not perform the acts of volition and personalty involved in the acceptance of a succession. The disability was removed by the Emperor Adrian in regard to donations and legacies, and soon legacies ad ornatum civitatis and ad honorem civitatis became frequent. Legacies for the relief of the poor, aged, and helpless, and for the education of children, were ranked of the latter class. This capacity was enlarged by the Christian emperors, and after the time of Justinian there was no impediment. Donations for charitable uses were then favored; and this favorable legislation was diffused over Europe by the canon law, so that it became the common law of Christendom. When the power of the clergy began to arouse the jealousy of the temporal authority, and it became a policy to check their influence and wealth  they being, for the most part, the managers of property thus appropriated  limitations, upon the capacity of donors to make such gifts, were first imposed. These commenced in England in the time of Henry III.; but the learned authors of the history of the corporations of that realm affirm, that cities were not included in them  "perhaps upon the ground, that the grants were for the public good;" and, although "the same effect was produced by the grant in perpetuity to the inhabitants," "the same practical inconvenience did not arise for it, nor was it at the time considered a mortmain." Mereweth. & Steph. Hist. Corp. 489, 702.
A century later, there was a direct inhibition upon grants to cities, boroughs, and others, which have a perpetual commonalty, and others "which have offices perpetual," and, therefore, "be as perpetual as people of religion." The English statutes of mortmain forfeit to the king or superior lord the estates granted, which right is to be exerted by entry; a license, therefore, from the king severs the forfeiture. The legal history of the Continent on this subject does not materially vary from that of England. The same alternations of favor, encouragement, jealousy, restraint, and prohibition, are discernible. The Code Napoleon, maintaining the spirit of the ordinances of the monarchy, in 1731, 1749, 1762, provides "that donations, during life or by will, for the benefit of hospitals of the poor of a commune, or of establishments of public utility, shall not take effect, except so far as they shall be authorized by an ordinance of the government."
The learned Savigny, writing for Germany, says: "If modern legislation, for reasons of policy or political economy, have restrained conveyances in mortmain, that those restrictions formed no part of the common law." The laws of Spain *406 contain no material change of the Roman and ecclesiastical laws upon this subject. The Beports of the Supreme Court of Louisiana (in which State these laws were long in force) attest their favor to such donations. De Pontalba v. New Orleans, 3 Ann. 660.
This legislation of Europe was directed to check the wealth and influence of juridical persons who had existed for centuries there, some of whom had outlived the necessities which had led to their organization and endowment. Political reasons entered largely into the motives for this legislation  reasons which never have extended their influence to this continent, and, consequently, it has not been introduced into our systems of jurisprudence. 2 Kent's Com. 282, 283; Whicker v. Hume, 14 Beav. 509.
The precise result of the legislation is, that corporations there, with the capacity of acquiring property, must derive their capacity from the sovereign authority, and the practice is, to limit that general capacity within narrow limits, or to subject each acquisition to the revisal of the sovereign. We have examined the legislation of the European states, so as better to appreciate that of Louisiana. No corporation can exist in Louisiana, have a public character, appear in courts of justice, exercise rights as a political body, except by legislative authority; and each may be dissolved, when deemed necessary or convenient to the public interest. Corporations created by law are permitted to possess an estate, receive donations and legacies, make valid obligations and contracts, and manage their own business. Civil Code, tit. 10, c. 1, 2, 3, art. 418, et seq.
The privileges which thus belong to corporations legally existing, have been granted to the inhabitants of New Orleans in various legislative acts. The authorities of the city have, besides, received powers of government extending to all subjects affecting their order, tranquillity, and improvement. It is agreed, that these powers are limited to the objects for which they are granted, and cannot be employed for ends foreign to the corporation. 1 Paige, 214; 15 New H. 317; 4 S. & S.C.R. 156; 3 Ann. 294.
But there can be no question as to the degree of appreciation in which the subject of education is held in Louisiana. The constitution of the State imposes upon the legislature the duty of providing public schools for gratuitous education; and various acts attest the zeal of that department in performing that public duty. Among these, there is one which authorizes and requires the corporate authorities of the city of New Orleans to establish them in that city, and to enact ordinances for their organization, government, and discipline; they are likewise *407 charged with the instruction, education, and reformation of juvenile delinquents and vagrants. These acts are from a sovereign authority, and endue the city with the powers of acquiring, retaining, and disposing of property, without limitation as to value, and assign to it, as one of its municipal functions, the charge of popular education. No parliamentary grant or royal license in Great Britain  no government ordinance in France  could remove more effectually a disability, if one existed, or create a capacity, if one were wanting, to the corporations of those countries. Rev. Stat. La. 41, 111, 116, 117, 144, 239; 2 Rob. 244, 491.
We shall now examine the devise to the cities, in connection with the various conditions annexed to it. The appellees insist it is a disposition reprobated by law, for that it contains "substitutions and fidei commissa," which are prohibited by article 1507 of the code, and which annul the donation in which they are found.
We shall not inquire whether the prohibition extends to donations in favor of corporations, and for objects of public utility, though this seems to have been a question in France. Lefeb. des Don. Pieuses, 31, 33.
We shall limit the inquiry to the nature of the prohibited estates, to determine whether they exist in this legacy. The terms are of Roman origin, and were applied to modes of donation by will, common during its empire, and from thence were transferred to the derivative systems of law in use upon the continent of Europe. The substitute was a person appointed by the testator to take the inheritance, in case of the incapacity or refusal of the instituted heir. A pater familias was authorized to make the will of his son during his nonage, or lunacy, or other incapacity to perform the act; and in the case of his death, under such circumstances, the appointee took the succession. This was a mode of substitution.
The fidei commissum originated in a prayer, petition, or request, of a testator upon his instituted heir, to deliver the inheritance, or some portion of it, to a designated person. Every testament being originally a law of succession, proposed by the testator, and consented to by the Roman people, the language of legislation, that is, of mandate and authority, was essential to its validity. Precatory words were insufficient to raise an obligation upon the heir, or to vest property in the donee. This was afterwards changed, and words of request then imposed a charge upon the heir, to maintain the faith in which the testator had confided. Afterwards, the distinctions between words of mandate and of request became obsolete, and both were considered with reference to their significance of the intentions of *408 the testator. The notion of a fidei commissum thus became limited, implying no more than an estate in possession, encumbered with the charge to surrender it to another. This might be pure and simple  that is, the duty to surrender might be immediate, or it might be on a condition, or after the expiration of a term even extending to the life of the gravatus. The substitute originally came in the place of another; the idea was modified to include those who came after another under certain circumstances.
The conjunction of the fidei commissum with the substitution would then become a natural mode of settlement of property. The instituted heir might be charged to hold and enjoy the succession for his life, and at his death that it should go to another, (his heir,) and that heir might in turn become a gravatus, for the benefit of another successor, and so from generation to generation.
Such a substitution might be properly called a "substitution fidei commissaire," or an "oblique substitution." This mode of limiting estates from degree to degree, and generation to generation, was much employed on the continent of Europe, and served to accumulate wealth in a few families at the expense of the interests of the community. The vices of the system were freely exposed by the political writers of the last century, and a general antipathy awakened against it. Substitutions having this object were prohibited during the revolution in France, and that prohibition was continued in the Code Napoleon, whose authors have exposed with masterly ability the evils which accompanied them. Motifs et Dis. 375.
This prohibition was transferred to the code of Louisiana, with the addition of the fidei commissa. These terms imply a disposition of property through a succession of donees. The substitution of the article 1507 of the code being an estate for life, to be followed by a continuing estate in another by the appointment of the testator.
The fidei commissa of the Louisiana Code are estates of a similar nature, implying a limitation over from one to another. They are the fidei commissa of the Spanish and French laws, in so far as those estates are not tolerated by other articles of the code. We shall not attempt to define them from an examination of the code and the reports of the Supreme Court of that State. It is not necessary for the decision of this case. We are unable to perceive any thing in the code to justify the supposition that the English system of trusts, whether in its limited signification as applied in conveyancing, or in its broad and comprehensive import, as applied by the courts of chancery, were within the purview of the authors of this code in framing *409 this prohibition. The terms substitution and fidei commissa are words foreign to the English law. They are applied to no legal relation which exists in it, and describe nothing which forms a part of it. The technical words, of "charged to preserve and to render," in article 1507, which embrace so much to a continental lawyer, only provoke inquiries in the mind of one accustomed to the language of the common law. The allusion to the "Trebillianic portion" is to a right of which there has never been a counterpart in the English system. The whole article refers exclusively to things of a continental origin. The estates known as fidei commissa and substitutions, in so far as regards the order of persons and the duration of their interest, may be created by devise in an English will. This can be done without the interposition of trustees or with them. That is, legal estates or equitable estates can be limited to embody those conditions of the fidei commissa and substitution; but the separation of the same estate into parts, legal and equitable, with separate courts in which their respective qualities may be represented, is not of continental origin. We may say of this as Sir William Grant says of another doctrine of equity, "that in its causes, its objects, its provisions, its qualifications, and its exceptions, it is a law wholly English." We find nothing of the fidei commissa or substitution in the legacy to the cities. The mischiefs resulting from conveyances in mortmain, and which led to restraints upon them, also existed in the substitutions of the French law, and led to their suppression. The remedies for the mischief, in consequence of the difference of the persons, were essentially variant. In the case of natural persons, the abrogation of the capacity to limit property from successor to successor, and generation to generation, removed the evil of perpetuities. But no statute against estates tail, or of remainder, or reversion, operate upon a corporation. The mischief results from the duration of the corporation and the tenacity with which, from its nature, it holds to property. The fee-simple estate to a corporation is that which most effectually promotes the creation of a perpetuity. The remedy in Europe in this case was to restrict the number of corporations, and to reserve an oversight of their acquisitions to the sovereign authority. This precaution was taken, as we have seen, also in Louisiana. If she has granted to her metropolis an unrestricted license to acquire and to hold property, we must conclude there were sufficient motives to justify the act.
Our next inquiry will be, whether the testator is authorized to define the use and destination of his legacy. We have seen that donations to the cities of the Roman empire followed immediately upon the senatus consullum which allowed them to *410 take, and that the destination of such donations to public uses was declared. Domat says, "One can bequeathe or devise to a city or other corporation whatsoever, ecclesiastical or lay, and appropriate the gift to some lawful and honorable purpose, or for public works, for feeding the poor, or for other objects of piety or benevolence." Domat, Lois Civiles, b. 4, tit. 2, § 2.
The city of New Orleans holds its public squares, hospitals, levees, cemeteries, and libraries by such dedications. This court says, (New Orleans v. United States, 10 Peters, 662,) "That property may be dedicated to public use, is a well-established principle of the common law. It is founded in public convenience, and has been sanctioned by the experience of ages. Indeed, without such a principle, it would be difficult, if not impracticable, for society, in a state of advanced civilization, to enjoy those advantages which belong to its condition, and which are essential to its accommodation."
The Supreme Court of Louisiana, in a number of cases, have applied the principle contained in these citations with confidence. DePontalba v. New Orleans, 3 An. 662; Will of Mary, 2 Rob. 440; Duke of Rich. v. Mylne, 17 La. 312; Maryland and Louisiana v. Roselius, MS.
The code of Louisiana provides that donations made for the benefit of an hospital, of the poor of the community, or of establishments of public utility, shall be accepted by the administrators of such establishments. C.C. 1536. It may be very true this article relates merely to the formal manner by which donations, inter vivos, for such objects may be perfected; but it will be observed that the requirement of the French Code of a government license for the gift is dispensed with in the frame of this article, and a strong implication arises from its terms in favor of the validity of such gifts. An acceptance of such donations in a will is unnecessary. Nor do we see any ground for inferring a prohibition of donations by will, which are lawful, inter vivos, in the absence of any prohibitive article in the code. We are of the opinion, therefore, that the testator might declare the uses to which he destined his legacy to the cities; and the destination, being for purposes within the range of the powers and duties of its public authorities, is valid.
We shall now examine the question, whether the conditions annexed to this legacy, the prohibition to alienate or to divide the estate, or to separate in its management the interest of the cities, or their care and control, or to deviate from the testator's scheme, invalidate the bequest.
The appellees contend that the performance of these conditions is impossible; they are contrary to public policy; introduce tenures at variance with the laws; and would result in mischief *411 to the State. That the conditions are of the essence of the gift, and the will would not conform to the dispositions of the testator, if they should be erased or disregarded. They insist that the appellees take by virtue of the law, but the devisees claim under a will. That, if they cannot exhibit a clear and valid devise of the property, the legal right of the heir should not be defeated. That this court cannot, under the guise of judicial construction, sanction an instrument from which the main prescriptions of the testator are obliterated.
The argument on this point against the cities possesses great logical force. It is admitted that illegal or immoral conditions will vitiate a contract, (C.C. 2026); but the code provides that, "in all dispositions inter vivos and mortis causa, impossible conditions, those which are contrary to the laws or to morals, are reputed not written." The authorities cited establish that, under the word "conditions," the various modes of appropriation, use, and destination attached to this legacy are included. Merlin says, "Conditions take different names according to their object; they are called in turn charges, destinations, motives, designations, terms. But although the conditions, charges, destinations, &c., &c., ought to be distinguished, nevertheless the word condition often serves to express them all." Merlin's Rep. Cond. § 2.
The signification of this article of the code becomes then an important inquiry. It is found in the Digest of Justinian, and from thence passed into the codes of France and Spain. Touil. 5, No. 255; 1 Escrich. Dic. leg. 565. It was copied from the Code Napoleon into the Code of Louisiana. Savigny furnishes us with the history of the law as found in the Pandects. One of the schools into which the Roman jurisconsults was divided (Proculeians) placed the construction of contracts and testaments, containing illegal or impossible conditions, on the same principle, and insisted that the whole disposition in each should be vitiated by them; another (Sabinians) changed the rule with reference to the instrument, and, while contracts were vitiated by the illegal or immoral conditions, in wills the conditions only were pronounced nugatory. Justinian adopted the opinion of the latter, which seems to have been preferred in practice before; and his adoption has been regarded as a legislative sanction of their rule in favor of testaments. Great authorities in France oppose this doctrine, and in Prussia it exists, but in a modified form, while it has been wholly rejected in Austria. 5 Toul., No. 247; Savig. Rom. Law, § 122-3-4.
The common-law rule depends upon the fact, whether the performance of the illegal, immoral, or impossible condition is prescribed as precedent or subsequent to the vesting of the estate of the devisee. In the former case, no estate exists till *412 the condition is performed, and no right can be claimed through an illegal or immoral act. In the latter case, the estate remains, because it cannot be defeated as a consequence of the fulfilment of an illegal or immoral condition. This, however, applies only to devises of real estate; for the ecclesiastical and chancery courts, in regard to bequest of personalty, follow the rule of the civil law, as above expressed. 1 Rop. Leg. 754-5; 7 Beav. 437; 1 Eden, R. 140; 2 Spence, Eq. J. 229.
The conditions in the case before us, which impose restraints upon alienation and partition, and exact a particular management through agents of a specified description, are conditions subsequent, and would not, by the rule of the common law, divest the estate, if pronounced to be illegal or immoral. 3 Pet. S.C.R. 377; 1 Sim. R.N.S. 464; 7 E.L. & Eq. 179; 2 J.C. Scott, C.B.R. 883; 2 Zabriskie R. 117; 10 Ala. R. 702.
These conditions belong, too, to the class that are reprobated as repugnant to the legal rights which the law attaches to ownership. The common law pronounces such conditions void, in consequence of that repugnancy, and the civil law treats them as recommendations and counsel, not designed to control the will of the donee. 1 Rop. Leg. 785; 4 Kent's Com. 130; Toul. 5, No. 51; Id. No. 405; Dalloz. Dic. tit. Cond. 96; 10 E.L. & E.R. 23.
Our opinion upon the article of the code we have cited is, that it does not prescribe a rule of interpretation, to aid the understanding of the courts in finding the intention of the testator, but that it is a peremptory enactment of the legislative authority, applicable to the subject-matter in all cases, without reference to any declared or presumed intentions of the author of a particular donation. The code treats such conditions in contracts as the wrong of both the parties, and annuls the act. In the case of the testament, while it refuses to allow the condition, it saves to the innocent legatee the disposition in his favor. It may be that this is done on the presumption that, independent of the condition, the legatee is the favorite of the testator, or from a consideration of the legatee alone. Savigny Rom. Law, § 122, et seq.
We have thus far treated the cities as occupying an equal position, and have considered the case with reference to the city of New Orleans alone.
The city of Baltimore is legally incorporated, and endowed with the powers usually granted to populous and improving cities. The General Assembly of Maryland, in 1825, authorized the city to establish public schools, and to collect taxes for their support; and, in 1842, it was empowered to receive in trust, and to control for the purposes of the trusts, any property which *413 might be bestowed upon it, by gift or will, for any of its general corporate purposes, or in and of the indigent and poor, or for the general purposes of education, or for charitable purposes of any description whatsoever, within its limits. The legal capacity of the city, therefore, corresponds with that of the city of New Orleans. Do the laws of Louisiana make a discrimination?
The code declares, "that all persons may dispose of or receive by donations, inter vivos or mortis causa, except such as the law declares expressly incapable." C.C. 1456. There is no distinction between corporations and natural persons in the power to receive by donation, nor do we find any discrimination between domestic and foreign corporations, except, perhaps in a single article. "Donations may be made in favor of a stranger, when the laws of his country do not prohibit similar dispositions in favor of a citizen of this State." C.C. 1477.
We greatly doubt whether this article applies to all the citizens or corporations of the States of the Union. The constitutional relations between the citizens of the different States are those of equality, in reference to the subject of this article. This court, in the case of the Bank of Augusta v. Earle, (13 Pet. 520,) said, "that by the law of comity among nations, a corporation created by one sovereignty is permitted to make contracts in another, and to sue in its courts; and that the same law of comity prevails among the several sovereignties of the Union. This comity is presumed from the silent acquiescence of the State. Whenever a State sufficiently indicates that contracts which derive validity from its comity are repugnant to its policy, or are considered as injurious to its interests, the presumption in favor of its adoption can no longer be made.
These principles were applied to a purchase of lands by the corporation of one State in another. Runyon v. Coster, 14 Pet. 122.
The principles of these cases have been adopted in Louisiana. 4 Rob. La. R. 517; 17 La. R. 46, 312.
We know of no departure from these principles in Maryland, and do not doubt that the corporations of Louisiana would take in the same manner as those of Maryland in that State.
The question remains to be considered, whether the destination of the legacy to public uses in the city of Baltimore affects the valid operation of the bequest. All the property of a corporation like Baltimore is held for public uses, and when the capacity is conferred or acknowledged to it to hold property, its destination to a public use is necessarily implied. Nor can we perceive why a designation of the particular use, if within the general objects of the corporation, can affect the result; nor is there *414 any thing in the nature of the uses declared in this will which can withdraw from the legacy a legal protection.
Neither do we concede that the uses, being in a degree foreign to the State of Louisiana, impair the effect of the will. It is well settled that, where property is conveyed to a use which would be protected, if to be executed at home, in the absence of a prohibition, the conveyance would be valid if the execution were ordered to take place abroad. This question was considered by Mr. Justice Story, in the opinion prepared by him for the case of the Baptist Association v. Smith, published in 3 Pet. 486, 500.
He says, "there is no statute of Virginia making such bequests void; and, therefore, if against her policy, it can only be because it would be against the general policy of all States governed by the Common Law." He concludes: "there is no solid objection to the bequest, founded upon the objects being foreign to the State of Virginia." In the late case of Whicker v. Hume, (14 Beav. 509,) on appeal, (16 Jur. 391,) a bequest to trustees, to be appropriated in their absolute and uncontrolled discretion, for the benefit and advancement and propagation of learning in every part of the world, as far as circumstances will permit," was pronounced valid. We find nothing in the Code of Louisiana indicating a spirit less comprehensive or catholic; we shall not, therefore, infer the existence of a restriction where none has been declared. We are of the opinion, that the uses for which the testator has devised his estate to the city of Baltimore, are approved alike in the legislation of Louisiana and Maryland, and that the execution of them may be enforced in their courts.
We have considered the legacy without a reference to the annuities which the testator has charged upon it. It is only necessary for us to determine a single question in regard to them. Are the heirs at law interested in the question of their legality?
The Civil Code (C.C. 1697) declares "that legatees under a universal title, and legatees under a particular title, benefit by the failure of those particular legacies, which they are bound to discharge."
It will be seen that all the annuitants, having a distinct character from the cities, have a claim upon them for their annual allowance. Should these annuities be invalid this charge would be removed, and the cities relieved. Such was the decision of the Supreme Court of Louisiana, (Prevost v. Martel, 10 Rob. 512,) and such the conclusion of the Court of Cassation, in Hanaire v. Tandon, the report of whose judgment is appended to one of the briefs of the appellants.
*415 The annuities created to establish an Asylum for the Poor and a School Farm  and of the validity of which grave doubts exist  are charges upon the legacy of the cities. If the directions of the testator cannot be legally complied with, the charge will be remitted without defeating the legacy. Sav. Roman Law, § 120, 129.
We shall not express any decided opinion in reference to either of the annuities, but leave the question of their validity to be settled by the persons interested, or by the tribunals to whose jurisdiction they appropriately belong.
We have considered it to be our duty to examine the several questions which arise upon the record, so that the important interests involved in them may be relieved from further embarrassment and controversy. In our opinion, the failure of the devise to the cities would not have benefited the appellees; for that the limitation over to the States of Maryland and Louisiana would have been operative in that event.
We close our opinion with expressing our acknowledgments for the aid we have received from the able arguments at the bar, and the profound discussions in the Supreme Court of Louisiana, with whose judgment we have concurred.
The decree of the Circuit Court for the Eastern District of Louisiana is reversed, and the cause remanded to that court, with directions to dismiss the bill of the plaintiffs with costs.

Order.
This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the Eastern District of Louisiana, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said Circuit Court in this cause be, and the same is hereby, reversed, with costs; and that this cause be, and the same is hereby, remanded to the said Circuit Court, with directions to that court to dismiss the bill of the complainants, with costs in that court.