THE COMMERCIAL BANK OF NEW ORLEANS *v.* THE CITY OF NEW ORLEANS.

Where the words of a law are dubious, their meaning may be sought by examining the context with which the ambiguous words, phrases and sentences may be compared, in order to ascertain their true meaning; and this rule is no less applicable to contracts than to laws. See Article 1943 C. C.
A proposition should always be interpreted, *secundum subjectam materiam*.
When the intent of the parties is doubtful, the construction put upon it, by the manner in which it has been executed by both or by one, with the express or implied assent of the other, furnishes a rule for its interpretation. In a doubtful case the agreement is interpreted against him who has contracted the obligation.
The usage under a statute, if ambiguous, is its best interpreter. *Optima legam interpres consuedo.*
A charter granted in consideration of water supplied for *public* purposes will not be construed so as to apply to quasi-public purposes such as for the City Hall, etc. A "public" purpose is for the universal public, and not a portion of it.

APPEAL from the Sixth District Court of New Orleans, *Howell*, J.

E. *Rawle for plaintiff.*—The act creating the corporation of the Commercial Bank of New Orleans was passed by the Legislature of Louisiana in the year 1833. Acts, p. 151.

It is stated in the preamble of the act that the chief object of the company is to be the conveying of water from the river into the city of New Orleans and its faubourgs, and into the houses of the inhabitants. The sections 4, 11 and 38 relate particularly to the conveying of water.

Section 38 contains the following enactment: "That the corporation of New Orleans shall be supplied by the said company, free of charge, with all the water necessary for the extinguishment of fires and any other public purposes: nor shall the city council be subjected to any charge for water furnished to supply the gutters of the said city and faubourgs; and that the company, as they progress in laying aqueducts, shall place, free of any charge whatever, two hydrants of a proper construction in front of each square, at a suitable distance from each other, from which a sufficient quantity of water may be conveniently drawn for extinguishing fires, for wetting, washing and watering the streets and gutters, and any other public purpose; that on the squares which do not front on the river, the hydrants shall be placed on opposite sides of the streets, at an equal distance from each other and the corners; that the said hydrants shall be of a proper size, and made so as, at all times, to furnish water for the fire engines and purposes herein mentioned, at all times, during the continuance of this charter, unless prevented by some unavoidable accident; and in case such shall occur, the repairs shall be made and the water again furnished at the expiration of the necessary delay; and the said company shall supply a sufficient quantity of clear, pure and wholesome water for the use of the inhabitants, within the limits aforesaid, at the elevation of fifteen feet when the same may be required; provided, however, that said hydrants shall be under the control of the Commercial Bank."

The attention of the court is first drawn for the correction of an error. It is said in the petition, that the city of New Orleans had not paid for the water furnished to certain establishments and places in the year 1853, and that a warrant,, issued for the purpose, had not been paid. This is

an error. At the trial, it was shown that the warrant had been paid. So <span style="float:right">Com'cial Bank<br>v.<br>New Orleans.</span> much as relates to this part of the case is not to be considered.

At page 4, the petition continues: and it is further shown that the city of New Orleans is now indebted to the Commercial Bank of New Orleans for water furnished and supplied in the years 1854, 1855, 1856, 1857, 1858 and 1859, and an account is annexed to the petition, for each year, in detail. The whole cost during six years amounts to $12,930.

The water was furnished and supplied to the public schools, to the offices of the city hall, to the offices of the recorders, to the houses of refuge, to the parish prison, to the corporation prison, to the watch-houses, to the workhouses and to the sugar platform.

*Percy*, witness, has been in the employ of the Commercial Bank since its organization; all the items in the account are correct; it is in the hand-writing of witness, and was made out by him.

Witness states that from the first establishment of the water works, the accounts against the city of New Orleans, for all water supplied for the several items charged in the said accounts were regularly made out every year, presented and paid each year, without objection, until the year 1854, since which the city has refused to pay the accounts. Witness means to say that the account was made out and paid for all water suppled for any items such as charged in the account on file, but that there are some items in the account for which water was not taken in the first instance; refers particularly to the items for water on account of the public schools. There were no such schools till some years after the water works were established; thinks no water was ordered to be supplied to public schools until about 1844 or 1845 ; but as soon as water was taken for the schools, the charge for such water was made, and was paid, without objection, un-til 1854.

There was no house of refuge till the year 1851, or thereabout. But the items for the district courts, prisons and watchhouses were charged in the accounts from the beginning, and paid regularly each year until 1854.

The hydrants referred to in the section 38 of the charter were put up, as the charter requires, at the expense of the company, and have been since maintained free of charge, and all water required from these hy-drants, for any and all public purposes whatsoever, has been supplied, free of charge, to the city.

The cost of maintaining those hydrants amounts to nearly $6,000 a year. In witness' opinion, the quantity of water supplied to the city through these hydrants, if charged at the company's rates, would exceed, in wit-ness' estimation, sixty thousand dollars per annum.

When water was ordered by the city to be supplied, in any other mode than by means of those hydrants, the cost of the pipes laid down for that purpose was paid by the city, and the water furnished in that way charged for and paid by the city, as already stated, till the year 1854, when the first objection on the part of the city was made.

The sugar platform was not supplied with water until 1858. The pipes were laid down at the request of the city, in 1858, and were paid for by the city. .

The witness proceeds: The account for water supplied to the city in

Com'cial Bank 1854, as the same is filed herein, has been regularly made out and charged
New Orleans. on the books of the company for each year, but has remained in suspense
until this suit was instituted.  The witness concludes his testimony by
stating that all the water for the several items in account were furnished
at the instance and request of the city.

*Blair*, witness, corroborates, so far as his knowledge extends, and says
also, that all the accounts for the water supplied by the company are pay-
able on the 1st of January of each and every year in advance.

February 6, 1860.  The District court rendered judgment in favor of
the Commercial Bank of New Orleans for $12,930, and interest as stated.

October 9, 1860.  The city of New Orleans appealed.

If it is supposed that the Commercial Bank is required to furnish the
city corporation with water for every purpose for which the latter may ask
to have it; or if, when furnished, the city need not pay for it, then there
is a grave error and a wrong conclusion.

The chief object of the creation of the Commercial Bank, we are in-
formed, was to convey water from the river into the city of New Orleans
and its faubourgs and into the houses of the inhabitants, and that such
object would greatly contribute to the security of said city from fire and
to the health and convenience of the inhabitants.  Thus we see that con-
venience, health and security were in view; the convenience and health
of the inhabitants, and the security of the city from fire.  To aid and
effect this, and to furnish the means and facilities therefor, the company
is required to furnish water for the extinguishment of fires, and for
wetting and washing the gutters and streets, and for any other public
purposes, and that there shall be no charge for such supply.  In order to
supply water for these purposes, the company place, at their own ex-
pense, hydrants or fire plugs in each square, from which may be drawn a
sufficient quantity of water for the purposes which are mentioned.

After twenty years' compliance, the corporation of New Orleans now
refuses to pay for the water supplied and furnished to the places and
establishments which are stated in the petition and by the witnesses.

Is there any ground or reason for such refusal?  First, it must be
stated that in all that relates to conveying of water, the law creating the
company has not been changed or amended.

We have seen in the section 38 the purposes for which water shall be
supplied, free of charge.  They are, extinguishment of fires, wetting the
streets, washing the gutters, and other public purposes.

It is not apparent that there is any doubt or mystery in the language of
the section.  A short examination, however, and some remark must be
presented to the court.

1. To know the meaning of each word used in the section might be
sufficient in order to interpret the expressions.  What is the meaning of
the word public?  In the dictionary of Richardson, it is said that "pub-
lic" signifies "of, or pertaining or belonging to the people, the many,
the multitude."  In the Louisiana Code, we find: "Public things are
those, the property of which is vested in a whole nation, and the use of
which is allowed to all members of a nation."  Art. 444.  Things which
are for the common use of a city or other places, as streets and public
squares, are likewise public things."  Art. 145.  According to these de-

finitions, the intention of the legislature seems to be free from doubt or Com'cial Bank question; and that the supply of water to the mayor's office and other New Orleans. *v.* places mentioned in the petition is not for public purposes, and therefore the supply is not free of charge. The object and nature of the supply, the places to which it is furnished, and the manner in which it is used, exclude any other construction.

2. But apart from all criticism and verbal signification, we can find a suitable and appropriate construction in the act of incorporation, by analysis and by comparison. To this mode of construction we are directed by the Civil Code : "When the words of a law are dubious, their meaning may be sought by examining the context, with which the ambiguous, phrases and sentences may be compared, in order to ascertain their true meaning. C. C. 16.

In order to apply this rule, we must first learn the nature or character of the supply of water for extinguishment of fires and wetting the streets. It may be safely asserted that these are public purposes. But if it be doubted, let the remaining part of the sentence be examined. We find there the words "other" and "other purposes." The word "other" is a corelative and specifying word, and its use proves the meaning of the previous part.

Thus it is shown, in two ways, that extinguishing fires and wetting the streets are public purposes. Now, it is only for public purposes that water shall be supplied free of charge, and without being paid for. Is the supply of water, as stated in the petition and by the witnesses, for a public purpose? Taking the meaning and intent from the reasoning and authorities referred to, we find that it is not. We find the sense of one clause by comparing it with others, whose meaning is obvious. E. C. L. R. 42, 14.

Thus the meaning of a word or a phrase may be ascertained frequently by looking at other words in the same law, and particularly in the same sentence. *Copulatio verboeum indicat acceptationem, in eodem sensu.*

3. There is another provision, however, in the same section, 38, which serves to give aid in the interpretation and construction. It is said, "that the said hydrants shall be of a proper size, and made so as, at all times, to furnish water for the fire engines and purposes herein mentioned."

The purposes "herein mentioned" are those which are mentioned in section 38, and they are public purposes. For such it is plain that the water furnished shall be only that which is drawn from the street hydrants. For a public purpose, no other mode is intended, and the provision quoted is exclusive of any other. Referring again to the petition and evidence, we find that for none of the purposes mentioned, is the water taken from the street hydrants, nor is it applied to the extinguishment of fires or wetting the streets.

It is not required to extend the examination of the act of the legislature. To the foregoing may be added the understanding and acquiescence of twenty years' duration.

The District court decided correctly that none of the charges stated in the petition were for water supplied for any public purpose, and were not free of charge.

The Commercial Bank of New Orleans expends yearly about $6,000 to

COM'CIAL BANK *v.* NEW ORLEANS. maintain the street hydrants in good condition. The estimate of the value of the water furnished by means of the street hydrants exceeds sixty thousand dollars per annum, and for this nothing is paid by the corporation of the city or by the inhabitants.

*Miles Taylor and Thos. H. Hewes for defendant and appellant.*—This is a case in which the plaintiffs seek to set aside the plain provisions of a contract between themselves and the State of Louisiana, and which was introduced into the contract for the benefit of the people of the city of New Orleans, on the authority of an error fallen into on the part of the city officials, at different times, since the making of that contract. The temporary practice of the city in paying the charges made against it improperly, by the plaintiff, on which their right to recover in the present action is based, is not ancient enough to have the force of a custom; nor did it obtain at such times, or under such circumstances, as to give it any weight as affording any evidence of the construction placed upon it by the parties making the contract.

This will be at once apparent from two facts which are patent on the record : 1. The act of the legislature of the State, in which the contract is contained, was passed in 1833; and, 2. The city was not a party to the formation of the contract, and is only a beneficiary under it.

The question presented in the cause, then, is this : What is the extent of the obligation imposed on the plaintiffs by the act of 1833, in favor of the city of New Orleans?

We shall not make a written argument on this question; but now present to the court the following points, as those chiefly to be insisted on in the oral one to be made to the court.

1. It was the intention of the legislature to require a supply of all the water needed for any public purpose, within the limits of the city and its faubourgs, from the plaintiffs, free of charge.

2. Water required for any use which is to be paid for out of the money in the city treasury, is water supplied for a "public purpose," and, as such, it is to be supplied by the plaintiffs to the city, free of charge.

3. The provisions of the 38th section of the plaintiffs' charter, directing two hydrants, of a proper construction, to be placed by plaintiffs, "free of any charge whatever," in front of each square, were not intended to limit the supply of water for public to that to be furnished by those hydrants, but was only designed to limit the obligation of the plaintiffs in furnishing the fixtures requisite for distributing and carrying water to the points where it was to be made use of.

4. The provisions contained in the act No. 228 of the acts of 1852, approved March 17th, 1852, support the construction of the act of 1833, contended for by the appellant.

ILSLEY, J. This action was instituted by the plaintiff to recover from the defendant the aggregate sum of twelve thousand nine hundred and thirty dollars, for water furnished and supplied by the plaintiff to the public schools, to the offices of the city hall, to the offices of the recorders, to the houses of refuge, to the parish prison, to the corporation prison, to the watchhouses, to the workhouses and to the sugar platform, as the same is particularly set forth in the plaintiff's petition and in the detailed account annexed to it.

The plaintiff's demand is resisted by the city, which traverses it, by <span style="float:right">Com'cial Bank<br>*v.*<br>New Orleans.</span> setting up the general issue.

The plaintiff had judgment for the whole amount in the court below, and from that judgment this appeal is taken.

The defence, on which the defendant relies to defeat the plaintiff's claim is, that, under the charter of the Commercial Bank, it was incumbent on it to supply all the water needed for any public purpose, within the limits of the city and its faubourgs, free of any charge; and, if this were really so, the plaintiff's claim should be rejected.

To determine whether this position is a tenable one, reference must be made principally to the thirty-eighth section of the act of incorporation, which, as the result of our present enquiry depends upon a correct solution of it, is herein transcribed, *in extenso:*

"Sec. 38. Be it further enacted, that the corporation of New Orleans shall be supplied by said company, free of charge, with all water necessary for the extinguishment of fires and other public purposes; nor shall the city counsel be subjected to any charge for water furnished to supply the gutters of the said city and faubourgs; and that the said company, in the progress of laying aqueducts, shall place, free of any charge whatever, two hydrants of a proper construction, in front of each square, at a suitable distance from each other, from which a sufficient quantity of water may conveniently be drawn, for extinguishing fires, for wetting, washing, watering the streets and gutters, and any other public purpose; that, on the squares which do not front on the river, the hydrants shall be placed on opposite sides of the streets, at equal distance from each other and the corners; that the said hydrants shall be of a proper size, and made so as at all times to furnish water for the fire engines and purposes herein mentioned, at all times during the continuance of the charter, unless prevented by some unavoidable accident, and in case such shall occur, the repairs shall be made and the water again furnished at the expiration of the necessary delay; and the said company shall supply a sufficient quantity of clear, pure and wholesome water, for the use of the inhabitants within the limits aforesaid, at the elevation of fifteen feet, when the same may be required: provided, however, that the said hydrants shall be under the control of the Commercial Bank."

In connection with section thirty-eight, it will be useful to refer to a portion of section eleven of the same act, which provides for the expeditious progress of the water works: "so that the city of New Orleans and the faubourgs thereof, may be furnished with water in the streets; and such inhabitants may procure it by means of conduits or pipes, within their houses and lots, at a price to be regulated by the company." Had the purposes for which water was to be furnished to the city, free of charge, been fully specified in section thirty-eight, or elsewhere in the act, no question could possibly have arisen as to the purposes intended; but the use of the words "other public purposes," as the complement to the specified purposes, in one instance, and the words "any other public purpose," in the second instance, is what gives rise to this controversy and necessitates a judicial interpretation of the section referred to, in order to determine whether the charges set out in the bill of particulars are exigible or not.

The contract contained in the plaintiff's charter was one between them and the State, and the connection between the city and the water works company has existed from the outset, and is of the most intimate character, if the city was not actually a party to it. The city furnished two out of the five commissioners. It was authorized to subscribe, and did subscribe for five thousand shares of the capital stock of the company, not subject to reduction. It might annually appoint a committee, to have access to such of the books of said bank as relate to the water works, and to make such extracts from the same as it might deem necessary. The very object of the incorporation of the company was, as stated in the preamble of the charter, "to convey water from the river to the city and its faubourgs," to contribute, among other things, "to the security of the city from fire."

Reading sections 11 and 38 of the plaintiff's charter or contract, with the view of ascertaining the common intent of the parties, and, to this end, applying to it those rules of interpretation which the law furnishes to unravel doubtful or obscure clauses in statutes or contracts, we are not greatly embarrassed in putting, as we think, a correct construction on that section which requires the bank to supply water to the city of New Orleans, free of charge, for the *public* purposes therein prescribed.

The first rule for the interpretation of a law is found in Article 16 of the Civil Code:

"Where the words of a law are dubious, their meaning may be sought by examining the context, with which the ambiguous words, phrases and sentences may be compared, in order to ascertain their true meaning;" and this rule is no less applicable to contracts than to laws. See Article 1943 C. C.

These rules are merely the enunciation of the one founded in common sense, that a proposition should always be interpreted *secundum subjectam materiam.*

The words, "and other public purposes," first used in the section 38, are intended as the complement to the only prescribed purpose, so far mentioned : the furnishing of water necessary for the extinguishment of fires, free of charge; and the words, "for any other public purpose," subsequently found in the same section, are also used as the complement not only to the first prescribed purpose, the extinguishment of fires, which is again mentioned in the same connection, but to other prescribed public purposes, for "wetting," "washing" and watering the streets and gutters; and the words, "other public purposes," and "any other public purpose," are to be understood as being of a like character with the public purposes specially mentioned; and they are all, whether specially described or embraced in the more general or comprehensive term, to be subserved in the mode, and the only mode, prescribed in section 38.

The act of incorporation contemplated and provided but one place, and one mode, by which the city was to be furnished, without charge for the necessary supply of water for the public purposes mentioned, specially or generally. The place was "in the public streets," and the mode was through the company's hydrants placed therein, and controlled solely by them. That was one of the prescribed modes; the other mode was a lateral division of the water from the main pipes or aqueducts, through con-

necting pipes, into the yards and houses of inhabitants; but, that supply, Com'cial Bank by the last mode, at a certain elevation, to whomsoever and for whatever New Orleans. use it was furnished, was not intended to be a gratuitous supply, or one free of charge, but for a *price* to be fixed by the company.

The *mode* of supplying water, free of charge, for public purposes, is a key to the sense in which those words must be understood. It was the supply to be furnished *in the streets* and *through the hydrants.* This view of the obligation imposed on the bank to furnish water to the city, free of charge, for every public purpose, might supercede the necessity of enquiring into the verbal signification of the word " public," as used in section 38. Whatever was the character of the described *public* purposes, the use of the words *other* and *any other* public purpose, put all the public purposes, whether special or general, if not into the same class, upon an equal footing, so far as related to the mode of satisfying them.

Under the Roman law, things for public use were divided into two kinds *only:* 1. Those destined for the common use of mankind, and which every one might freely use, such as rivers, seas, the banks of rivers and the sea shore. These things were destined by nature for public use. 2. Those things which public policy deemed necessary and appropriate in spiritual or temporal affairs. In the last mentioned class were embraced the streets, highways, market places, the places where courts of justice were held, colleges, town-houses and other public places. Domat, book 1, tit. 8.

Art. 445 of our Code subdivides the last class into two kinds: 1. Common property, to the use of which all the inhabitants of a city, or other place, are entitled in common; such as the streets, the public walks and the quays; and, 2. Common property which, though it belongs to the corporation, is not for the common use of all the inhabitants of the place; but may be employed for their advantage by the administrators of its revenues.

The "public purposes" intended by the legislature in the act of incorporation are such as bear relation to the things properly classed as public things, and which are included in the first division of common things, in Art. 449, such as the streets, the public walks, etc.

It was not contemplated that such buildings or establishments as are included in the second division of common things, and which are not for the common use of *all* the inhabitants of the city, although employed for their advantage, such as the city hall, the court house, the public school, etc., should receive from the bank a supply of water free of charge.

The purposes specially mentioned in Art. 38 are strictly *public* purposes, connected with public things, in which all are interested, and which are for the common use of all; and "other public purposes" contemplated by the legislature were, it is safe to presume, of a like character.

If water was needed for any quasi-public purpose, to be furnished gratuitously, provision should have been made for it in the charter, which prescribes the obligations of the bank, and which no consideration of public convenience can render more onerous.

The act of the legislature, passed in 1852, at page 158, exempting the property held by the plaintiffs from any taxation by the city of New Or-

Com'cial Bank leans, provided "that all charitable institutions in the said city be sup-
New Orleans. plied with water free of charge," was simply a proposition to the plain-
tiffs to grant them this boon; provided they would supply, not all the pub-
lic or quasi-public institutions in the city, which were then paying with-
out objection, but only all charitable institutions (public and private) in
the city. It throws no light on the contract or charter granted in 1833,
even if the bank had accepted the proposal, unless the fact being mani-
fest that all the public charitable institutions in the city had been furnish-
ed, up to the date of the act, with water, for a price paid by the city; that
the exemption from such payment in future, for a valuable consideration,
was virtually a recognition by the legislature that the construction which
the parties had put upon the words, "other public purposes," was the
correct one.

It is in proof that, up to the year 1854, more than twenty years after
the date of the charter, the plaintiff and defendant have put upon the
sections 38 and 11 the construction we now put upon it. Up to that time,
the water rates were always paid for the purposes described in the peti-
tion; and this is a fit case to apply the rule of interpretation found in Arts.
1951 and 1957 of the Civil Code. See also 11 A. 113; 10 A. 601; 4 A. 441;
2 A. 475; 1 A. 230, 232.

It has been held by this court, that "the usage under a statute, if am-
biguous, is its best interpretation." *Optima legum interpres consuetodo.*

"The common interpretation of statutes which had existed for a length
of time, will be considered, as it generally is, the correct interpretation."
1 Hen. Dig. 1861, 786–7.

In *Clay* v. *Bullard*, 9 Rob. 308, it was held that "contracts will be con-
strued as the parties must be supposed to have understood them at the
time of their execution.

It has been held that the intention of the parties must be sought in the
whole language and the surrounding circumstances, to which the instru-
ment itself points. *Peck* v. *Bemis*, 10 A. 160.

The argument of defendant's counsel, that water required for any use
which is to be paid out of the money in the city treasury, is water sup-
plied for a public purpose, and as such, it is to be supplied by the plain-
tiff, free of charge, is wholly untenable, unless the words used, "other
public purpose" and "any other public purpose," are equivalent to and
convertible terms with "any purpose whatever," which are no where to
be found in the charter.

The judgment of the District court is according to law and the evi-
dence, and must be sustained.

It is therefore ordered, adjudged and decreed, that the judgment of the
District court be affirmed, the costs of appeal to be paid by the appellant.

HOWELL, J., recused.