## The Alberto.[1]

### Forstall and others v. The Alberto.[1]

*(Circuit Court, E. D. Louisiana. June 12, 1885.)*

1. **Admiralty Jurisdiction — Maritime Contracts — Charter-Party — Admiralty Lien.**

   A charter-party is a maritime contract, and within the admiralty jurisdiction. It is well settled since *Insurance Co.* v. *Dunham*, 11 Wall. 1, that all contracts having reference to maritime service, maritime transactions, or maritime casualties, are maritime contracts, and within the admiralty jurisdiction of the courts of the United States. Whether the jurisdiction is *in rem* or *in personam* depends upon whether the contract imports a lien on the ship.

2. **Estoppel.**

   When the terms of an offer by cablegram were ambiguous, and misunderstood by the parties receiving and accepting the same, to the knowledge of the party making the offer, it was the duty of the latter to have at once given notice by cablegram of the misunderstanding, and to protest against the acceptance as made, and their failure to do so estopped them from denying the contract as made from such acceptance of their offer. They were silent when equity required them to speak.

Admiralty Appeal. Libel for advances. Cross-libel for damages for non-execution of charter-party.

*Henry Denis*, for libelants.

*Thomas J. Semmes* and *J. Carroll Payne*, for claimants.

PARDEE, J. The libelants are ship-brokers in New Orleans, who for some years have corresponded with a firm of ship-brokers in Bridgetown, Barbadoes, by the name of Da Costa & Co. On the fifth of November, 1883, the Austrian bark Alberto was in Barbadoes, and her master, being desirous of a cargo direct for Trieste, negotiated with said firm of Da Costa & Co., who thereupon, on said fifth day of November, sent the following cablegram to libelant, to-wit: "Can you use one vessel of 500 to 550 tons—Austrian bark Alberto, Trieste, direct?" This cablegram was received in New Orleans at 3:40 P. M. of the same day. At what time it came to the libelants does not appear, but on the same day the libelants, answering, sent the following cablegram: "7/3d., 7/16d. and 5% cotton. Must be of the highest class." Meaning thereby, 7s. 3d. for oil, 7s. 16d. and 5% primage for cotton. At what time this offer reached Da Costa & Co. does not appear, but they sent in reply this cable: "Offer accepted; the vessel leaves to-morrow to load cotton-seed oil, for Europe, at 7/3d."

This dispatch was received in New Orleans at 2:19 P. M. of the sixth November. Exactly what time the libelants received it, does not appear; they made no answer by cablegram or otherwise. In the meantime Da Costa & Co., on the part of libelants, entered into a charter-party with the bark Alberto, under which the libelants were to furnish said vessel a full and complete cargo of cotton-seed oil for

[1] Reported by Joseph P. Hornor, Esq., of the New Orleans bar.

Trieste, freight at 7s. 3d. per round barrel. The charter-party also stipulated that the libelants should advance cash for the necessary disbursements at New Orleans at $2\frac{1}{2}$% commission, and insurance. The master of the Alberto waited 48 hours at Barbadoes for a dispatch from libelants, but, receiving none, sailed under the charter for New Orleans, where she arrived on the morning of the twenty-sixth November. On the morning of the twenty-seventh the master reported to libelants. As to what was said between the parties at this time, the evidence is conflicting.

Taking the libelants' version as the true one, the libelants then notified the master of the Alberto that Da Costa & Co. had exceeded their instructions; that their cable to Da Costa & Co. quoted them freight on oil and cotton, and their intention was, and the cable so expressed it, that they, libelants, were to be at liberty to load the ship with oil or cotton, or both, at their option, and that, consequently, they could not recognize the charter signed by Da Costa as binding. They also told the master that they were perfectly prepared to carry out the offer they had made, and load a ship with a cargo of oil and cotton to Trieste; but they would not guaranty, and they could not guaranty, a full cargo of oil for the ship. The master said the vessel was unsuited for loading cotton, and he would not take cotton; that he wanted a full cargo of oil. The libelants told the master that if he wished they would try and get him a full cargo of oil, if he would allow them to go into the market and offer the ship. After some discussion, the libelants' chartering clerk, on the captain's say so, offered the ship for a full cargo of oil; then the libelants entered the ship in the custom-house, paid the tonnage dues, and made other disbursements for the ship, as sued for in the libel.

The master of the Alberto, however, did not understand the libelants' position with regard to the charter-party, for he proceeded to unload his vessel of ballast, and on the third day of December, 1883, he served on the libelants the following letter and notice:

"*Messrs. Forstall, Clayton & Co.*—GENTLEMEN: Please take notice that my vessel, the Austrian bark Alberto, chartered by you as per charter-party dated Bridgetown, the sixth of November, 1883, is ready to receive cargo at post 35, Third district, and that her lay days will commence to count to-morrow morning, the fourth instant.

"Yours, truly,

"ANDREA GRAGUEZ, Captain of the Aust. bark Alberto."

This notice seems to have cleared up the cloudy contracting atmosphere, for from this time on there seems to have been no more misunderstandings between the parties. The libelants discovered that the master of the Alberto insisted upon the charter-party as valid and binding; the captain discovered that the libelants repudiated the charter, and did not intend to be bound by it.

Immediately the libelants brought their libel, seizing the ship for advances made. The owners of the Alberto responded with a cross-

libel for damages for non-execution of charter-party. The amount of advances claimed in the libel is not disputed, nor is the rule of damages followed in the district court on the demands of the cross-libel disputed. The questions presented in this court are (1) whether the court has jurisdiction of the demands presented in the cross-libel; and (2) whether the libelants are bound for the damages resulting from their failure to comply with the obligations of the charter-party entered into on their behalf by Da Costa & Co.

1. The exception to the jurisdiction is on two grounds: that the cause of action is not the same, and that the alleged charter-party was only a preliminary contract (if a contract at all) of which the admiralty has no jurisdiction. A charter-party is a maritime contract, and within the admiralty jurisdiction. The cross-libelant alleges a charter-party, and claims damages for failure to comply with its stipulations. If there was no charter-party there was no contract, and cross-libelant has no case. The position of libelants is that there were preliminary negotiations looking to a contract, but no contract, because Da Costa & Co. had exceeded their instructions. If the charter-party as made bound the libelants, it was no preliminary contract. But, as I understand the question of jurisdiction, it is well settled, since *Insurance Co.* v. *Dunham*, 11 Wall. 1, that all contracts having reference to maritime service, maritime transactions, or maritime casualties, are maritime contracts, and within the admiralty jurisdiction of the courts of the United States. And see *Maury* v. *Culliford*, 10 FED. REP. 388. Whether the jurisdiction is *in rem* or *in personam* depends upon whether the contract imports a lien on the ship; and from this fact there has been some little confusion among practitioners in the admiralty courts on the question of jurisdiction. Most of the authorities cited in support of the exception in this case were cases where jurisdiction *in rem* was in dispute.

2. On the merits of the case the finding should be for the cross-libelant. The meaning of the three dispatches that passed between Da Costa & Co. and the libelants is to be found, if possible, from the dispatches themselves. No unexpressed intentions nor understandings of the parties sending these dispatches should be allowed to defeat the plain meaning of the dispatches themselves. *Locke* v. *S. C. & P. R. Co.* 46 Iowa, 109; *Merriam* v. *Pine City Lumber Co.* 23 Minn. 314; Civil Code La. arts. 1946 *et seq.* The second dispatch, being the reply sent by libelants to Da Costa & Co., is clear and unambiguous in offering to freight the Alberto with oil or cotton, and justified the immediate acceptance of the offer for a cargo of oil. I cannot agree with libelants that they retained an option to furnish a cargo of either oil or cotton, or both. On the contrary, I am inclined to the opinion that the option was on the other side, and that on the acceptance of the Alberto's master the obligation of the libelants to furnish a cargo of oil was fixed and certain. But it is not necessary to go so far in this case. Let it be conceded that the offer was as libel-

ants claim, the option being theirs, then it is clear that the terms of the offer were ambiguous, and were misunderstood by the parties in Barbadoes. In this state of the case it was the clear duty of libelants to have at once by cable notified the parties in Barbadoes that the offer was misunderstood, and have protested against the acceptance as made. Libelants were fully notified that the parties were acting, and that the vessel was about starting on a voyage, under a misapprehension arising from the terms of their own telegram. They should have spoken out without delay, and their failure to do so, their silence in the matter, estopped them when the Alberto reached New Orleans, and estops them now, from denying the contract. They were silent when equity required them to speak. And it is no answer to say that they supposed that as it takes a cablegram 18 to 24 hours to be received at Barbadoes from New Orleans, and as the cablegram of acceptance stated that the "vessel leaves to-morrow," there was not time to cable an answer before the vessel should leave Barbadoes. No matter when the vessel was to leave, or whether she had left, libelants should have dispatched to Da Costa & Co. immediately. Any other view of it would leave libelants with the advantage of ratifying or denying until the vessel should reach New Orleans. If freights advanced in the mean time, they could ratify; if freights went down, they could deny. In other words, for 20 odd days the ship would be bound, but the libelants free.

But the fact is, as appears from the evidence, a cablegram could be sent and an answer received between New Orleans and Barbadoes inside of 24 hours. From the fact that the acceptance was in answer to a dispatch of theirs sent on the evening of the 5th, the libelants should have known (as was the fact) that the acceptance was sent on the 6th, the day they received it, and that there was ample time to answer and have their answer received before the Alberto sailed from Barbadoes. This view of the case is well supported by authority:

"Equitable estoppel is the effect of the voluntary conduct of a party, whereby he is absolutely precluded, both at law and in equity, from asserting rights which might have otherwise existed, either of property, of contract, or of remedy, as against another person who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who, on his part, acquires some corresponding right, either of property, of contract, or of remedy." Pom. Eq. Jur. § 804 and note.

See, also, Id. § 805, where silence is recognized as conduct to work an estoppel, as well as language and acts. See, further, 2 Pars. Cont. 499; Story, Ag. § 74; title 4, c. 2, § 2, Civil Code La.; *Commercial Bank* v. *New Orleans*, 17 La. Ann. 190; Kerr, Fraud & Mis. 409; Bigelow, Estop. 502, in relation to *Hope* v. *Lawrence*, 50 Barb. 258; *Gregg* v.*Wells*, 10 Adol. & E. 90; *Cornish* v. *Abington*, 4 Hurl. & N. 549; Benj. Sales, 39; Pollock, Cont. 420; *Leather Cloth Co.* v. *Hieronimus*, L. R. 10 Q. B. 140.

I think it is clear that libelants are equitably estopped from denying the charter-party. As to a waiver on the part of the master of the Alberto by his consenting to let libelants put his ship in the market for cargo, it is clear, as we have found in the statement of the case, the parties never really understood each other correctly until notice of readiness of the Alberto under the charter-party was served on libelants. Up to that time the master seems never to have had an idea but that he was getting along nicely under the charter. There was no waiver. Let a decree be entered for claimant and cross-libelant the same as in the district court, and for all costs of this court.