(66 South. 237)

No. 19991.

CITY OF NEW ORLEANS et al. v. SALMEN BRICK & LUMBER CO.

(March 30, 1914. On Rehearing, Oct. 19, 1914.)

*(Syllabus by the Court.)*

1. CHARITIES (§ 20*)—MUNICIPAL CORPORATIONS (§ 224*)—RIGHT TO INHERIT AND HOLD PROPERTY—EDUCATIONAL TRUST.

The city of Baltimore is entitled under the laws of the state of Louisiana to inherit real and movable property located within that state, and to hold it in trust for a pious use, the education of the poor of that city. State v. McDonogh, 8 La. Ann. 171; McDonogh v. Murdock, 15 How. 367, 14 L. Ed. 732.

[Ed. Note.—For other cases, see Charities, Cent. Dig. §§ 18–33; Dec. Dig. § 20;* Municipal Corporations, Cent. Dig. §§ 623–625; Dec. Dig. § 224.*]

2. TAXATION (§ 242*)—EXEMPTION—PUBLIC PROPERTY.

"All public property" is exempt from taxation. Const. art. 230.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 394–403; Dec. Dig. § 242.*]

3. ADVERSE POSSESSION (§ 7*)—PRESCRIPTION —STATES.

Prescription shall not run against the state in any civil matter. Const. art. 193.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 24–42; Dec. Dig. § 7.*]

4. TAXATION (§ 242*) — EXEMPTION — PUBLIC PROPERTY—FREE SCHOOL FUND.

Education is one of the functions of government, and the free school fund is public property.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 394–403; Dec. Dig. § 242.*]

5. ADVERSE POSSESSION (§ 7*)—TAXATION (§ 213*) — PRESCRIPTION — EXEMPTION — "PUBLIC PROPERTY."

All public property used for governmental purposes, owned or held in trust by the sister states of the Union, and located in the state of Louisiana, is embraced within the terms of the law which exempts "all public property" from taxation and which declares that prescription shall not run against the state.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 24–42; Dec. Dig. § 7;* Taxation, Cent. Dig. § 353; Dec. Dig. § 213.*

For other definitions, see Words and Phrases, First and Second Series, Public Property.]

6. ADVERSE POSSESSION (§ 4*)—PRESCRIPTION —UNITED STATES.

Prescription does not run against the United States government. Pepper v. Dunlap, 9 Rob. 283, 288; Northern Pacific Co. v. Townsend, 190 U. S. 267, 23 Sup. Ct. 671, 47 L. Ed. 1044.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 7–10, 12–57; Dec. Dig. § 4.*]

7. TAXATION (§ 16*)—POWER TO TAX—SALARIES—UNITED STATES.

The United States government cannot tax the salary of a state judge or any other functionary of a state. The Collector v. Day, 11 Wall. 113, 122, 20 L. Ed. 122.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 46; Dec. Dig. § 16.*]

8. TAXATION (§ 6*)—POWER TO TAX—SALARIES—STATES.

The state government cannot tax the salary of a functionary of the United States, or any property belonging to it and used for public purposes. Dobbin v. Commissioners of Erie Co., 16 Pet. 435, 10 L. Ed. 1022; McCulloch v. Maryland, 4 Wheat. 316, 4 L. Ed. 579; Weston v. Charleston, 2 Pet. 449, 7 L. Ed. 481.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 18; Dec. Dig. § 6.*]

9. ADVERSE POSSESSION (§ 7*)—TAXATION (§ 213*) — PRESCRIPTION — EXEMPTION — PUBLIC PROPERTY.

The exemption of property of sister states of the Union from taxation, seizure, alienation, and prescription is as essential to those states as it is to this state; and the exemption of public property of sister states rests upon nec-

essary implication, and is upheld by the great law of self-preservation.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 24–42; Dec. Dig. § 7;* Taxation, Cent. Dig. § 353; Dec. Dig. § 213.*]

10. TAXATION (§ 213*)—ADVERSE POSSESSION —PRESCRIPTION—PUBLIC PROPERTY—MUNICIPAL CORPORATIONS—COMITY.

To tax, or permit to be prescribed against, the public property, used for governmental purposes, belonging to sister states and located within this state, when the laws of this state exempt public property from such burdens, would violate the comity between the states, which is an essential element of private international law.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 353; Dec. Dig. § 213.*]

11. ADVERSE POSSESSION (§ 7*)—TAXATION (§ 213*) — PRESCRIPTION — PUBLIC PROPERTY— MUNICIPAL CORPORATIONS—COMITY.

"Full faith and credit shall be given in each state to the public acts, records, and judicial proceedings of every other state." Const. U. S. art. 4, § 1.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 24–42; Dec. Dig. § 7;* Taxation, Cent. Dig. § 353; Dec. Dig. § 213.*]

Monroe, J., dissenting in part.

### On Rehearing.

12. TRIAL (§ 4*)—TRIAL OF SEPARATE ISSUE—ADVERSE POSSESSION.

As there is no rule requiring that a plea of prescription acquirendi causa must be tried separately, and as the plea requires oral proof to sustain it, it is better practice to refer it to the merits.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 8–10; Dec. Dig. § 4.*]

13. ADVERSE POSSESSION (§ 7*) — PRESCRIPTION—STATES—MUNICIPAL CORPORATIONS.

The constitutional provision that prescription shall not run against the state does not refer to municipal corporations. Article 193.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 24–42; Dec. Dig. § 7.*]

14. ADVERSE POSSESSION (§ 4*) — PRESCRIPTION.

Prescription runs against all persons unless they are included in some exception established by law. Rev. Civ. Code, art. 3521.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 7–10, 12–57; Dec. Dig. § 4.*]

15. ADVERSE POSSESSION (§ 8*) — PRESCRIPTION—MUNICIPAL CORPORATIONS.

The only exception established by law in favor of municipal corporations is that municipal property which is dedicated to a public use is not alienable, not subject to private own-

ership, and therefore cannot be acquired by prescription.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 14, 27, 43-57; Dec. Dig. § 8.*]

16. ADVERSE POSSESSION (§ 9*) — PRESCRIPTION—MUNICIPAL PROPERTY.

Municipal property which, though it belongs to the corporation, is not for the common use of its inhabitants but may be employed for their advantage by the administrators of its revenues, is alienable, subject to private owner-. ship and to the laws of prescription. Rev. Civ. Code, arts. 458, 481, 482.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 42, 50; Dec. Dig. § 9.*]

17. ADVERSE POSSESSION (§ 9*) — PRESCRIPTION—MUNICIPAL PROPERTY.

Property which was bequeathed to a municipal corporation under the condition, which has been pronounced invalid, that the property should never be sold but should be let to tenants and the rents used for public purposes, is alienable, is subject to private ownership, and may be acquired by prescription.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 42, 50; Dec. Dig. § 9.*]

18. PLEADING (§ 69*)—PETITION—ADMISSIONS —CONSTRUCTION—PRESCRIPTION.

An allegation in a joint petition filed by a municipal corporation and natural persons, plaintiffs in a petitory action, that the coplaintiffs have acquired from the municipal corporation an undivided interest in the property sued for, is an acknowledgment that the property is alienable, subject to private ownership and to the laws of prescription.

[Ed. Note.—For other cases, see Pleading, Dec. Dig. § 69.*]

Land and Sommerville, JJ., dissenting.

Appeal from Civil District Court, Parish of Orleans; Fred D. King, Judge.

Petitory action by the City of New Orleans and others against the Salmen Brick & Lumber Company and H. O. Stark, administrator of the succession of T. O. Stark. Union Lumber Company intervenes. From judgment for defendant, plaintiffs and intervener appeal. Reversed in part and affirmed in part.

I. D. Moore, City Atty., and John F. C. Waldo, Asst. City Atty., both of New Orleans, for appellant City of New Orleans. J. J. McLoughlin, Charles J. Theard, and J. Zach Spearing, all of New Orleans, for appellant City of Baltimore. F. Rivers Rich-ardson, of New Orleans, for appellant Stark. Gus. Lemle and Wm. Winans Wall, both of New Orleans, for appellees Salmen Brick & Lumber Co. and Union Lumber Co., Limited. Hall, Monroe & Lemann, of New Orleans, for several persons and corporations not parties, whose rights may be affected hereby. Richardson & Soule, of New Orleans, amici curiæ. Buck, Walshe & Buck, of New Orleans, for amici curiæ representing parties whose interest in pending litigation will be affected.

SOMMERVILLE, J. The city of New Orleans, the city of Baltimore, the Board of Trustees of McDonogh Institute of Baltimore, a corporation organized and incorporated under and by virtue of the laws of the state of Maryland, the widow and heirs of Jules Denis, together with other persons residing in the city of New Orleans, alleging themselves to be the owners in indivision of six squares, or parts of squares, located in the city of New Orleans, and lately belonging to the estate of John McDonogh, of New Orleans, and that said tracts of land are in the possession of said Salmen Brick & Lumber Company, defendant, bring this petitory action against defendant; and ask that they be recognized and put into possession of said property as the owners thereof.

H. O. Stark, administrator of the succession of T. O. Stark, of New Orleans, setting up title to a tract of land of which these six squares, or parts of squares, form parts, under a tax title issued by the state to him under Act 82 of 1884, intervenes, and claims the whole of the tract, of which said six squares form parts containing 177⅔ arpents. Mr. Stark pleaded the prescription of three years in support of his tax title. He did not join plaintiffs or defendant, but asked that petitioners' said title to the tract herein described be recognized, including the property here sued for.

The Salmen Brick & Lumber Company answered by general denial; pleaded the prescription of 10 and 30 years; and called upon its warrantor in title, the Union Lumber Company, to defend the suit.

The Union Lumber Company appeared and filed a plea of prescription of ten years.

The plea of prescription of ten years was sustained, and plaintiffs' suit, together with that of the intervener, was dismissed. Plaintiffs and intervener have appealed.

When the plea of prescription was called for trial, the intervener asked that the trial thereof be referred to the merits, as it involved the taking of testimony, and the motion was denied. Intervener reserved a bill to the ruling of the court, and he has appealed suspensively.

The ruling was correct, no sufficient reason has been assigned for referring a peremptory exception, which may put an end to the case, to a trial of the case on the merits, and thus inflict additional costs and expenses on litigants, and protract litigation unnecessarily. C. P. art. 345; Farmer v. Hafley, 38 La. Ann. 236; Jennings v. Vickers, 31 La. Ann. 679; Zerega v. Percival, 46 La. Ann. 590, 600, 15 South. 476; Saint v. Martel, 123 La. 815, 49 South. 582.

[1] The land involved in this case forms part of the estate left in the will of the late John McDonogh to the city of New Orleans and the city of Baltimore. The will was admitted to probate and ordered executed in 1852, as appears from the report of the case found in 8 La. Ann. 171.

John McDonogh died in New Orleans, and, by will, gave a large amount of real and personal property to the city of New Orleans (his adopted residence) and to the city of Baltimore (of his native state), and their successors, forever. The legacies were made for the purpose of "educating the poor, without the cost of a cent to them, in the cities of New Orleans and Baltimore, and their respective suburbs."

By the Civil Code of this state, corporations created by law are permitted to possess an estate, to receive donations and legacies, make valid contracts, and manage their own affairs.

The city of New Orleans is authorized and required to establish public schools for the free education of the youths of that city, etc. The city of Baltimore is authorized, by statute, to establish public schools, and to receive property in trust, and control and exercise the trust for any of its general corporate purposes, including educational and charitable purposes of any description, within its limits.

The will of Mr. McDonogh was contested by the states of Maryland and Louisiana and by his collateral heirs, and we hold in 8 La. Ann. 171, that the cities named, under the powers conferred upon them, had the right to receive these legacies, and that the will was valid. This opinion was concurred in by the Supreme Court of the United States in 15 How. 367, 14 L. Ed. 732.

In the course of the opinion, Eustis, C. J., says:

"That without a positive prohibition municipal corporations in Louisiana should be incapacitated from receiving legacies for the public purposes of health, education and charity, seems to me to be repugnant to all sound ideas of policy, and to the reason of the law."

We are of the opinion that municipal corporations, at least in this country, are authorized to take and hold, unless specially restrained, property, real and personal, in trust for purposes in aid of the objects of the corporation, or for objects which will promote, aid, or assist in carrying out or perfecting those purposes; and that they cannot dispose of property of a public nature, in violation of the trust for which it is held. A municipality may hold its own property as a natural person; but that which it holds in general as

a special trust, for administrative purposes, cannot be alienated, or the form of the property be changed without legislative authority. It can and must use such property or its proceeds for the purpose to which it has been destined. Board of Liquidation v. City of New Orleans, 118 La. 715, 43 South. 307; Dillon on Municipal Corp. § 991 (575).

Defendant and intervener are not here claiming that either of the cities plaintiff has undertaken to make title to them. The only legislative authority given to the city of New Orleans, so far as we are informed, to part with the ownership of the property given in trust by Mr. McDonogh, is found in Act No. 176, 1855, p. 230, where the city of New Orleans was given the right to partition said property between itself and the city of Baltimore, provided the cities of Baltimore and New Orleans concur in the act; and this partition was ordered to be made in kind. New Orleans v. Baltimore, 13 La. Ann. 162, 165. But it appears, as before stated, that the tract of land involved in this case has not been partitioned, and that the two cities plaintiffs are owners thereof in indivision.

[2, 4] The education of the youths of a state is one of the functions of government, and the public school system is a department of the government. Education insures domestic tranquillity, provides for the common defense, promotes the general welfare, and it secures the blessings of liberty to ourselves and our posterity. It has ever been recognized as a function of government by all the states of the Union. The United States government has always granted aid and support to the public schools of the several states of the Union. The state of Louisiana from the earliest time has made provision for the support of public education, beginning with the Constitution of 1845, arts. 135 and 136. Provisions therefor have been constantly increasing, until, in the Constitution of 1898, it is provided that taxes shall be levied to "educate the children of the state" (article 227); and poll taxes, taxes on inheritances, legacies and donations, special taxes, proceeds of vacant estates, the interest on all proceeds of all public lands, funds, and property heretofore or hereafter bequeathed, granted or bequeathed to the state for school purposes; and all funds and property other than unimproved lands, bequeathed or granted to the state not designated for any other purpose, go to make up the school fund. Articles 231, 232, 252, 254. And in the city of New Orleans, one-half of the surplus in the hands of the board of liquidation of the city debt is added to the fund. Article 255. Article 248 et seq. provide for the establishment of public schools throughout the state; and it is provided that "bequests to educational, religious, and charitable institutions" are exempted from the payment of inheritance taxes. Article 235. The charter of the city of New Orleans directs and commands the common council "to organize and maintain free public schools."

Public schools, their property and their funds, are parts of the government itself, and are therefore public property. And thus it is not subject to taxation, state, parish, or municipal, or to seizure, and it is not subject to the law of prescription mentioned in the Civil Code. Tulane Educational Fund v. Board of Assessors, 38 La. Ann. 297; State v. Finlay, 33 La. Ann. 114.

Laws protecting school funds are more strictly enforced than legislation of any other character. And property dedicated to such public use cannot be occupied or used by private individuals, or for private purposes. The property of Mr. McDonogh, bequeathed to the cities of New Orleans and Baltimore for educational purposes, is a trust, accepted by the governments of the cities, and it cannot be used by those governments for any other purpose. The control of that property is not only limited as to a

general use, for an object of a public character, but to the use of educating the youths of these cities. The management of that trust is limited not only by its nature and character, but also by those who are to receive its benefit. The trust, as is indicated by the word, has not been received or acquired by either city in a strictly private or personal capacity. It is to be used for another; the youths of the two cities; for a public purpose. It is a trust fund.

In the case of Commercial Bank v. City of New Orleans, 17 La. Ann. 190, 197, we recognize the division of the Roman Law of things for public use into two kinds:

"(1) Those destined for the common use of mankind, and which every one might freely use such as rivers, seas, the banks of rivers and the seashore. These things were destined by nature for public use. (2) Those things which public policy deemed necessary and appropriate in spiritual or temporal affairs. In the last-mentioned class were embraced the streets, highways, market places, the places where courts of justice were held, colleges, town houses and other public places."

And, under the constitutional provision which exempts public property from taxation, the property used and designed for public educational purposes has always been exempted from seizure and taxation; whether such property belongs to the state itself or to some political subdivision thereof, where the title is vested directly in the state or one of its subordinate political subdivisions. Meriweather v. Garrett, 102 U. S. 472, 476, 26 L. Ed. 197; Cordill v. Quaker Realty Co., 130 La. 933, 58 South. 819; Gachet v. New Orleans, 52 La. Ann. 813, 27 South. 348; City of Alexandria v. O'Shee, 51 La. Ann. 719, 25 South. 382; Dillon on Mun. Corp. § 1396; Cooley on Taxation, p. 172.

[3, 5] But the plea of prescription of three years set up by the administrator of the succession of Theodore O. Stark, who declared upon a tax title under Act 82 of 1884, was not tried or formally disposed of as to the city of New Orleans and city of Baltimore, and the Board of Trustees of McDonogh Institute of Baltimore. The application of that prescriptive term is held not to apply to state property in Slattery v. Heilperin, 110 La. 86, 34 South. 139.

What has been said with reference to the liability of public property, the public schools of the state, and of the political subdivisions of the state, to taxation, has application to the plea of prescription of ten years filed by the defendant. The provisions of the Code providing for ten years' prescription acquirendi causa has reference to affairs among the citizens of the state, private persons, and not to the state itself and to public things.

Prescription has for one of its bases a good and valid title in the possessor of the thing. And, as property dedicated or donated to a governmental agency for any public purpose, and that purpose is specially indicated, it cannot be alienated, or assessed for taxes, state, parish, or municipal, or sold for the nonpayment of taxes; there is, and cannot be, a good and valid title in defendant and its warrantors. The plea of prescription of ten years as to the city of New Orleans should have been overruled.

"One takes nothing from the public domain by the plea of prescription." Slattery v. Heilperin, 110 La. 86, 34 South. 139.

"No silence or length of time can deprive a corporation of its power over public places. Its inaction may give an estate by sufferances, but nothing more." Thibodeaux v. Maggioli, 4 La. Ann. 73; Delabigarre v. Second Municipality, 3 La. Ann. 230; Parish v. Second Municipality, 8 La. Ann. 145; Municipality No. 2 v. Orleans Cotton Press, 18 La. 276, 36 Am. Dec. 624; City of Baton Rouge v. Bird, 21 La. Ann. 244; City of Shreveport v. Walpole, 22 La. Ann. 526; Zagame v. City of New Orleans, 128 La. 388, 54 South. 916.

"In nearly every state, however, at present, the rule is that title to property held by a municipal corporation for a public use cannot be acquired by adverse possession, and in most of the few states holding to the contrary statutes have been recently enacted to conform to the majority rule." McQuillen, Municipal Corporations, § 1158.

There is no prescription established in the Code applicable to public property, and there

is none in the statutes of the state. C. C. art. 3470; State v. Buck & Fruit Co., 46 La. Ann. 656, 15 South. 531. It is not an object which may be acquired by prescription. C. C. art. 3479; Board of Education v. Martin, 92 Cal. 209, 28 Pac. 799; Const. art. 193.

This plea was properly sustained as to the individuals who made themselves parties plaintiff, and to H. Osborn Stark, administrator, intervener.

The remaining matter to be considered is the liability of the city of Baltimore for taxes on property belonging to it, when such property belongs to the public school fund of that city, and is being held and' used for educational purposes as a part of the public school system of the state of Maryland; and, secondly, as to whether the law of prescription, found in the Code, may be applied and enforced by one in adverse possession, claiming title under prescription. The city of New Orleans is authorized to acquire, retain, and possess, by donation or legacy, any property, real or personal, whether situated within or without said city (Act 53, 1840, p. 50). And we have decreed in the McDonogh Will Case, 8 La. Ann. 171, that the city of Baltimore has the same right, and we have sent it into possession of the property involved in this suit, to be used for "educating the poor" in the city of Baltimore. The property held by these two cities was given them in indivision by John McDonogh, and for a specific public purpose, and they have been put into possession as owners in indivision by the courts of this state. It is held by these cities in indivision, and for free, public educational purposes. No one part or portion of that property belongs to one of them. The whole belongs to both. Defendant and intervener cannot say that I am not in possession of public property belonging to the city of New Orleans, or that I am in possession of public property belonging to the city of Baltimore. New Orleans has

title, and Baltimore has title, to every portion of the property; and as defendant and intervener cannot possess or prescribe against the public property of the city of New Orleans, in any degree or in any manner, they cannot lawfully possess or prescribe against any portion of the property, even though an undivided portion is held by the city of Baltimore for public purposes.

We have already seen that public school property is public property, and that all public property in this state is exempt from taxation, and that the law of prescription is not applicable to the state of Louisiana, or to one of its subdivisions, where public property is involved. The right of the state to its public property or domain is absolute, and excludes that of its own subjects as well as other nations. Wheaton's Int. Law, p. 220.

The McDonogh land lying in Louisiana, and bequeathed to the city of Baltimore for educational purposes, like the bequest to the city of New Orleans for the same purpose, is a trust fund, hors du commerce, not liable to seizure, is inalienable, and prescription should not run against it; but a better reason for its not running against said property and city is the great public policy of preserving public rights and property from damage and loss through the negligence of public officers. The exemption from the effects of prescriptive statutes is essential to the well-being of the government of the state. And we have held that the maxim "Nullum tempus occurrit regi" is not restricted in its application to the state, but that it applies to municipal corporations as trustees of the rights of the public. In some other jurisdictions the law has been differently applied. Mayor v. Magnon, 4 Mart. (O. S.) 2, 8; Police Jury v. Foulhouze, 30 La. Ann. 64; Halpin v. Barringer, 26 La. Ann. 171; R. S. 1320, 3422.

[6] We have held that prescription does not run against the United States government. Pepper v. Dunlap, 9 Rob. 283, 288.

And in the case of Northern Pacific Co. v. Townsend, 190 U. S. 267, 23 Sup. Ct. 671, 47 L. Ed. 1044, where an individual claimed title by adverse possession under the statutes of limitation of Minnesota to a portion of the railway's right of way, the Supreme Court held that, although the plaintiff's right of way granted to it by the United States was subject to the police power of the state, an individual could not acquire title to any portion thereof by adverse possession under the statute of limitations of the state. The court, after stating that the grant of the right of way was for a specific purpose, say:-

"This being the nature of the title to the land granted for the special purpose named, it is evident that to give such efficacy to a statute of limitations of a state as would operate to confer a permanent right of possession to any portion thereof upon an individual for his private use would be to allow that to be done by indirection which could not be done directly."

[7-10] The city of Baltimore owns the property under discussion with the consent of this state, and under the laws thereof. It was made a legatee of said property under the will of John McDonogh, declared valid by the courts of this state. And as our general government provides for the equality of the states of the Union, and as the people of the several states have formed a general government for a more perfect union, for the establishment of justice, for insuring domestic tranquility, for providing for the common defense, for promoting the general welfare, and for securing the blessings of liberty to ourselves and our posterity, it is necessary that the laws of the several states shall have equal effect upon and application to the property of each sister state, located within the boundaries of that state, as it has upon its own property which is being administered for the public good. The forms of process and rules of evidence and prescription are governed by the lex fori, whether the parties be a state itself, a resident of that state, or residents of another state. The state of Louisiana having the public property of the state of Maryland within its territory, and therefore under its jurisdiction, the laws of the state applying to public property of the state itself will be applied to the public property of the state of Maryland within this territory. And as the public property of the state is not liable to taxation, or seizure, or alienation, without special legislative authority, and as an adverse title thereto may not be acquired by prescription, the public property belonging to the state of Maryland, or to one of its subdivisions, is entitled to the same exemptions. This is implied from the relations which exist among the United States. The free school system being one of the instrumentalities or functions of the government of the state of Maryland, it cannot be interfered with by the state of Louisiana or any of its citizens.

A similar point was disposed of by the Supreme Court of the United States in the case of The Collector v. Day, 11 Wall. 113, 122, 20 L. Ed. 122, where the court held that the United States government could not tax the instrumentalities of the state government and collect an income tax on the salary of a state judge.

In the case of Dobbin v. Commissioners of Erie County, 16 Pet. 435, 10 L. Ed. 1022, it was decided that it was not competent for the Legislature of a state to levy a tax upon the salary or emoluments of an officer of the United States. The decision was placed mainly upon the ground that the officer was a means or instrumentality employed for carrying into effect some of the legitimate powers of the government, which could not be interfered with by taxation, or otherwise, by the state, and that the salary or compensation for the service of the officer was inseparably connected with the office.

In the cases of McCullogh v. Maryland, 4

Wheat. 316, 4 L. Ed. 579, and Weston v. Charleston, 3 Pet. 449, 7 L. Ed. 481, it was decided:

"That the state governments cannot lay a tax upon the constitutional means employed by the government of the Union to execute its constitutional powers."

The Chief Justice, in McCullogh v. Maryland, as the organ of the court, says:

"If the states may tax one instrument, employed by the government in the execution of its powers, they may tax any and every other instrument. They may tax the mail; they may tax the mint; they may tax patent rights; they may tax judicial process; they may tax all the means employed by the government, to an excess which would defeat all the ends of government. This was not intended by the American people. They did not design to make their government dependent on the states."

That the power of taxing it (the bank) by the states may be exercised so far as to destroy it, is too obvious to be denied. It was observed by the court, in the case of McCullogh v. Maryland, that the power of taxation by the states was not abridged by the grant of a similar power to the government of the Union; that it was retained by the states; and that the power is to be concurrently exercised by the two governments; and, also, that there is no express constitutional prohibition upon the state against taxing the means or instrumentalities of the general government. But it was held to be prohibited by necessary implication; otherwise, the states might impose taxation to an extent that would impair, if not wholly defeat, the operations of the federal authorities when acting in their appropriate sphere. And in the case of The Collector v. Day, it was shown that, upon the same construction of the Constitution, and for like reasons, the general government is prohibited from taxing the salary of a judicial officer of a state. The court there recognized the general government and the state, although both within the same territorial limits, as separate and distinct sovereignties, acting separately and independently of each other within their respective spheres. The former, in its appropriate sphere, is supreme; but the states, within the limits of their powers not granted, or, in the language of the tenth amendment, "reserved," are as independent of the general government as that government is independent of the state.

And it was therein held, because of the dependence of the general government for its existence upon the several states of the Union, that it was a reasonable, if not a necessary consequence, that the means and instrumentalities employed for carrying on the operations of the state governments, for preserving their existence, and fulfilling the high and responsible duties assigned to them by the Constitution, should be left free and unimpaired, should not be liable to be crippled, much less defeated, by the taxing powers of another government, which power acknowledges no limit but the will of the legislative body imposing the tax; that the two governments are upon an equality; and the question is: whether the power "to lay and collect taxes" enables the general government to tax the salary of a judicial officer of the state, which officer is a means or instrumentality employed to carry into effect one of the state's most important functions, the administration of the laws, and which concerns the exercise of a right reserved to the states; and the question was answered in the negative.

If the means and instrumentalities employed by a general government and of this state to carry into operation the powers granted to them are, necessarily, and for the sake of self-preservation, exempt from taxation and the law of prescription, then are also the instrumentalities of government of a sister state exempt from taxation, seizure, alienation, and prescription in this state. The unimpaired existence of those instrumentalities in the one state is as essential as in the other. The ex-

emption of a sister state, under the circumstances indicated, rests upon necessary implication, and is upheld by the great law of self-preservation. If the means employed by a government in conducting its operations are subject to the control of another and distinct government, then the first government can exist only at the mercy of the latter.

The public property of a sister state located in this state might be likened to the diplomatic departments of foreign governments, where the diplomats, their families, suites and effects are immune from the laws of the state to which they are accredited, or through which they may be passing. And ambassadors, ministers, troops passing through, ships of war, all municipal institutions, are immune from the laws which apply to the inhabitants of the states through which they pass. And, surely, our sister states, and the property belonging to them, in our territory, are entitled to the same protection as is accorded to the property of this state by the laws thereof.

Judge Dillon, in his valuable work on Municipal Corporations (section 1396 [773]), refers to a case where the city of Brooklyn attempted to tax property devoted to a public use within its territory and belonging to the city of New York, in the following language:

"The general statutes of the state upon the subject of taxing property undoubtedly refer to private property, and not to that owned by the state; and, in view of the public nature of municipalities, and the purposes for which they are established, heretofore explained, the author is of the opinion that such enactments do not, by implication, extend to any property owned by them—certainly to none owned by them for public uses. On this principle the city of Brooklyn cannot impose a tax upon land in that city owned and used by the city of New York and by its lessee as a ferry landing in connection with a ferry franchise granted by its charters, to the last-named city. On the same ground it was held that a sale of land, the property of a city corporation, and constituting a part of the city cemetery, for taxes, was void. The sound principle is that property owned by the United States, by a state, or by a municipality for public uses, is not subject to be taxed unless so provided by positive legislation."

A contrary decision to that of the state of New York is reported in 85 Kan. 178, 116 Pac. 251, 50 L. R. A. (N. S.) 243, Ann. Cas. 1912D, 800, in the case entitled State of Kansas ex rel. Taggart v. Holcomb. There a water plant belonging to Kansas City, Mo., but located in that part of Kansas City which is within the state of Kansas, was assessed for taxation by the state of Kansas, and the court held that the piece of public property was liable to taxation in Kansas, although the public property of Kansas was exempt. We do not concur in this interpretation of the law of exemption of public property from taxation.

The state of Louisiana declares "all public property" shall be exempt from taxation. The exemption is wholesome and sound; the language used, "all public property," is written large, is strong, and is all-embracing; it is clear and explicit; and it cannot be limited in its scope by interpretation so as to confine the exemption to only that public property within its domain which belongs to itself. "All public property" located in the state of Louisiana is exempt. The language is too clear not to be strictly followed.

It is the same with reference to prescription; it does not run against the state of Louisiana.

[11] We ask the state of Maryland and the city of Baltimore to give full faith and credit to the public acts, records, and judicial proceedings of the state of Louisiana, and to rely upon them. Having declared "all public property" shall be exempt from taxation in Louisiana, and that prescription shall not run against the state, it would be an unfair discrimination against the state of Maryland to hold that its public property was liable to taxation here, and that the citizens of Louisiana could acquire the public property of that state by prescription. To do so would prevent our sister states from giving full faith and credit to our public acts. They

could not rely upon them. Such use of power would reverse the spirit, if not the letter, of the Constitution of the United States, and substitute a wrong for a right. It would do more; it would violate the comity between the states, which is an essential element of private international law, and which instructs the government of one state to extend to sister states of the Union the equal application of the law to public property used for governmental purposes by sister states, located within this state, that is applied to public property used for governmental purposes of this state.

One of the strongest foundations on which the Constitution of the United States rests—one which was taken from the Articles of Confederation, and which gives to the structure of our government much of the stability which, in the course of time, it has acquired—is found in article 4, § 1, Constitution of the United States, which is as follows:

"Full faith and credit shall be given in each state to the public acts, records, and judicial proceedings of every other state."

The plea of prescription filed to the suit of the city of Baltimore should have been overruled.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be reversed in part and affirmed in part; that it be reversed in so far as it sustains the pleas of prescription filed by the defendant, the Salmen Brick & Lumber Company, Limited, and its warrantor, the Union Lumber Company, to the suit of the city of New Orleans, the city of Baltimore and the Board of Trustees of the McDonogh Institute of Baltimore; and that as to these plaintiffs the pleas of prescription are overruled; and that as amended the judgment appealed from is affirmed. Costs of appeal to be paid equally by appellees, intervener, and those plaintiffs whose appeal has not been sustained.

The case is remanded to be proceeded with in accordance with law, in so far as the cities of New Orleans and Baltimore, and the Board of Trustees of McDonogh Institute are concerned.

MONROE, J., dissents in so far as the judgment holds that the property of the city of Baltimore is exempt from taxation in this state and is not subject to the law upon the subjection of the prescription in favor of tax titles.

PROVOSTY, J., not having heard the argument, takes no part.

On Rehearing.

O'NIELL, J. On reconsideration of this case, we have confined our inquiry to the only question submitted to and decided by the district court; that is, whether the defendant has acquired title to the property in dispute by the prescription of ten years, as against any or all of the plaintiffs. The validity of the intervener's asserted tax title has not been put at issue. The question whether the property in contest was exempt from taxation while it was owned by the two municipal corporations to whom it had been given in aid of public education need not be considered, except perhaps in so far as there is or may be an analogy between an exemption from taxation and an exemption from the plea of prescription.

[12] In the bill of exceptions reserved to the ruling of the trial judge, refusing to refer the defendant's plea of prescription to the merits, it appears that the plaintiffs joined the intervener in his motion to refer the plea to the merits and in his objection to a separate trial of the plea. After a further consideration of the ruling, we are of the opinion that it would have simplified matters and would have been better practice to have referred the plea to the merits. On the trial of the

plea, all parties introduced their titles in evidence, and the record is as full and complete as if the case had been tried upon its merits. There is no rule requiring that a plea of prescription acquirendi causa, which is one of the means of acquiring title and which requires the taking of oral testimony, should be tried separately and before a trial of the case on its merits. The authorities cited in support of such a rule do not sustain it. For example, in the case of Jennings v. Vickers, 31 La. Ann. 679, the exception was one of misjoinder of parties, not a plea of prescription. In the case of Farmer v. Hafley, 38 La. Ann. 232, the exception was a denial of the alleged agency and authority of the person upon whom service of citation had been made as the agent and attorney in fact of the absent defendant. It was an exception of want of citation and had no reference to the merits of the case. In Zerega v. Percival, 46 La. Ann. 590, 15 South. 476, the exceptions were: First, that the allegations of the petition were vague and indefinite; and, second, that the suit for the nullity of a will on account of suggestion or captation was barred by the express terms of article 1492, R. C. C. This court said that these were in the nature of exceptions of no cause of action and that they were properly submitted and decided on the face of the pleadings. In the last case cited (Saint v. Martel, 123 La. 815, 49 South. 582), the exception or plea set forth that the matter in dispute had been settled by compromise after the filing of the suit. Approving the ruling of the trial judge, referring this plea to the merits, it was said:

"That was a matter en pais, to be established by evidence. It could not be disposed of on the face of the papers."

And, referring to all of the authorities above mentioned, it was further said:

"This court, in Jennings v. Vickers, 31 La. Ann. 679, Farmer v. Hafley, 38 La. Ann. 232, and Zerega v. Percival, 46 La. Ann. 601, 15 South. 476, did make use of the language copied in relator's application for the writs; but it was not intended to lay down an invariable rule on the subject of referring peremptory exceptions to be disposed of with the merits. That matter is to some extent left to the discretion and judgment of the trial judge, to be acted on as may best subserve the administration of justice under differing circumstances."

In the judgment of the district court, the plea of prescription in the present case was maintained as against all of the plaintiffs and the suit was dismissed. This carried with it a dismissal of the intervention, reserving to the intervener his right to assert hereafter whatever claim he may have, because the suit was not tried on its merits.

In our original opinion and decree, the judgment rendered by the district court against the cities of New Orleans and Baltimore and the Board of Trustees of the McDonogh Institute of Baltimore was reversed, and the case was remanded for a trial of the suit of these plaintiffs on its merits. In all other respects the judgment was affirmed. A rehearing was granted on the application of the defendant and its warrantor and the intervener.

The defendant and its author in title have had, publicly and continuously for nearly 18 years prior to the filing of this suit, physical possession of the land in dispute (except the square No. 769, to which the defendant does not assert title), under the following authentic acts of sale properly recorded: The defendant purchased from the Union Lumber Company, on the 15th of July, 1907, for $60,000. The latter, defendant in warranty, bought from the H. Weston Lumber Company, on the 18th of November, 1899, for $22,500. The H. Weston Lumber Company bought from Henry Lagardere, on the 22d of May, 1895, for $6,000. In this latter act of sale, it is recited that certain designated squares of the land conveyed were purchased by Lagardere from Theodore O. Stark by an act of sale passed before Frederick Deibel, notary pub-

lic, dated the 8th of August, 1888, recorded in Conveyance Book 129, p. 375, and that the other squares enumerated were bought by Lagardere from Charles Ribo, by act of sale before the same notary on the 30th of March, 1894, recorded in Conveyance Book 151, p. 285. The lumber companies above named erected a sawmill, established a lumber yard, built their office and other structures on the land, and used the premises for their lumber business, without complaint from the plaintiffs or intervener until the filing of this suit.

The intervener, H. Osborn Stark, as administrator of the succession of Theodore O. Stark, alleges that the latter purchased a tract of land containing 177⅜ arpents (of which the land in contest forms a part) at a tax sale made on the 12th of November, 1889, for the delinquent taxes assessed in the name of Mrs. Charles Hamilton; and that, by an authentic act dated the 11th of November, 1892, the widow of Charles D. Hamilton, having acquired the interest of A. H. Isaacson in this land, confirmed and ratified the tax title. As will be noted hereafter, the interest of A. H. Isaacson, which is claimed by the widow and heirs of Jules Denis as plaintiffs in the present suit, was an undivided ⁷/₉₀ interest. The intervener alleges, but has not offered proof in support of the allegation, that Theodore O. Stark had actual possession of the property from the date of his purchase at the tax sale. He therefore pleads the prescription of three years under article 233 of the Constitution in support of his tax title and in defense of any attack upon it. This plea of prescription has not been tried.

The plaintiffs allege that they own the six squares of ground, described in their petition, under the titles which were recognized by the judgment of the civil district court of the parish of Orleans, in the suit of City of Baltimore v. City of New Orleans, affirmed by this court and reported in 45 La. Ann. 526 et seq., 12 South. 878. They allege that the land was owned by Mathew Morgan, Samuel Jarvis Peters, Levi Pierce, and Henry William Chase, who sold it to John McDonogh on the 10th of February, 1836; and that his title was confirmed by an act of Congress of the 7th of June, 1858. They allege that John McDonogh bequeathed the property to the cities of New Orleans and Baltimore for a public purpose, that is, for free education; and that the two cities were recognized as the legatees of McDonogh and were put into possession of all of his estate under the terms of his will.

For a clear understanding of the title under which the cities of New Orleans and Baltimore owned this property, reference must be had to the testament of John McDonogh. After giving to his sister and her children certain special legacies and to certain slaves their freedom, the testator bequeathed all the rest, residue, and remainder of his estate to the mayor, aldermen, and inhabitants of New Orleans, his adopted city, and to the mayor, aldermen, and inhabitants of Baltimore, his native city, and their successors forever, one-half to each of said cities. Then he stipulated that the bequest was for the several intents and purposes stated, and especially for the establishment and support of free schools in the cities and their respective suburbs for the poor (and the poor only) of both sexes and of all classes and castes of color. He provided that the Holy Bible, both the Old and New Testament, should be used always as one of the school books, and that singing should be taught so that the pupils might acquire the rudiments of music and learn to sing sacred music. He then stipulated that none of his real estate should ever be alienated by the cities, but that it should all be let to tenants and the revenues expended for the purposes mentioned in his will. He provided that one

eighth of the revenues of his *general estate* should go to the American Colonization Society, in Washington, as an annuity for 40 years or until it should amount to' $25,000: another eighth of the revenues was to go as an annuity to an asylum for the poor of both sexes in New Orleans until it would amount to $600,000; another eighth of the revenues was to be given to a society for the relief of. the destitute orphan boys of *New Orleans until it reached* the sum of $400,000; and still another eighth of the revenues was to be devoted to the establishment of a school farm for the destitute boys of Baltimore, to the amount of $3,000,000. The remaining half of the revenues of his *general estate,* until the four annuities amounting respectively to $25,000, $600,000, $400,000, and $3,000,000 should be paid off, and thereafter the entire revenues, were to be divided between the cities of New Orleans and Baltimore and dedicated to the establishment and support of their free schools. Provision was made for the appointment of trustees of the various funds and annuities, and the method of administration was prescribed in the most minute detail. The testator willed that, in the event the bequest to both or either of the cities should lapse by a refusal to accept or from any other cause, the legacy bequeathed to New Orleans should go to the state of Louisiana and the bequest to Baltimore should go to the state of Maryland, that the Legislature of each state might carry out the intentions of the testator as expressed in his will and in the manner appearing to the Legislature most proper. He appointed as executors of his will eight citizens of New Orleans, six citizens of Baltimore, the president and secretary of the American Colonization Society of the City of Washington, and the secretary of the Board of Foreign Missions of the Presbyterian Church of the City of New York. The estate con-

sisted of hundreds of thousands of acres of land situated in several parishes in Louisiana and of thousands of lots of ground in New Orleans.

The states of Louisiana and Maryland attacked the will in our state court, and the collateral heirs of John McDonogh attacked it in the United States court, contending that the bequest to the cities of New Orleans and Baltimore was null because it contained *fidei commissa and substitutions* prohibited by our Civil Code. In the judgment of the United States Supreme Court (in Executors of John McDonogh et al. v. Mary Murdoch et al., Heirs of John McDonogh, 15 How. 367, 14 L. Ed. 732), and in the judgment of this court (in State of Louisiana, State of Maryland intervening, v. Executors of John McDonogh and City of New Orleans, 8 La. Ann. 171), the bequest to New Orleans and Baltimore was pronounced valid. As we interpret the opinions in these cases, it was held that the conditions on which the bequest was made to the cities did not amount to a "prohibited substitution," which would have annulled the bequest, and that, in so far as these conditions amounted to a fidei commissum, the conditions were to be reputed as not written, leaving the bequest valid. R. C. C. art. 1519 (1506). It was said that, public education being a function of municipal government, the bequest to the cities was a donation for this worthy purpose, or what is defined in our Code as a gift for pious uses. . It was declared that the two cities acquired the property in full ownership, and not as trustees, except to the extent that all property of a municipal corporation is held in trust for the benefit of its citizens.

In their petition in the present suit, the plaintiffs have not stated in what proportions they claim this property, except by their reference to the judgment rendered in the

suit of the City of Baltimore v. City of New Orleans, No. 19,511 of the docket of the civil district court, No. 11,171 of the docket of this court, which judgment was affirmed and is reported in 45 La. Ann. 526, 12 South. 878, et seq.

The record of the case to which the plaintiffs refer for a determination of their respective interests shows that the city of Baltimore sued the city of New Orleans for a partition of the original tract of 177 arpents, praying that it be divided in kind if practicable, and, in the alternative, that it be partitioned by licitation, that is, by a sale of the property and a division of the proceeds, if a division of the property itself was not practicable. The plaintiff in the case referred to alleged that Mrs. Sarah Daniels, wife of A. H. Isaacson, and Miss Emily Daniels, the only heirs of John L. Daniels, deceased, claimed an undivided half interest in the land, by virtue of a contract said to have been made by the cities of Baltimore and New Orleans with John L. Daniels for procuring the confirmation of the title of the cities by an act of Congress; but the plaintiff denied that such contract had been made by the city of Baltimore. The city alleged, however, that it was proper that the question of the ownership of the land should be settled; wherefore the city of New Orleans and Mrs. Isaacson and Miss Daniels were called upon to assert their claims. The petitioner alleged that the land should be surveyed by the surveyor of the city of New Orleans, "for the purpose of ascertaining its exact location and description, so as to enable the court to decide whether the same was (is) susceptible of partition in kind"; and it was alleged that:

"In point of fact, the said city of New Orleans, at the request of petitioner, had (has) ordered the city surveyor to make such survey, which had (has) not been done."

In answer to the suit, the city of New Orleans admitted its joint ownership with Baltimore, denied that any other parties had an interest in the land, and concurred in the plaintiff's prayer for a partition. An intervention was filed by A. H. Isaacson, John Buckingham, L. N. Desharoon, A. T. Steele, Mrs. Emily Daniel Brenham, and Mrs. Sarah Isaacson, wife of A. H. Isaacson, alleging that John L. Daniels had acquired a half interest in the land under a contract with the cities of Baltimore and New Orleans, for procuring a confirmation of title; that John L. Daniels sold half of his interest to C. D. Hamilton, John Buckingham, and L. N. Desharoon, jointly, on the 20th of June, 1859, and sold the other half of his interest to A. T. Steele on the 22d of June, 1859; that A. T. Steele transferred the interest thus acquired by him to the two daughters of Daniels, namely, Mrs. Sarah Isaacson and Mrs. Emily Brenham, on the 30th of January, 1871; and that C. D. Hamilton sold his interest to A. H. Isaacson on the 25th of February, 1860. After the filing of these pleadings, it developed that the cities of New Orleans and Baltimore had, on the 2d of May, 1859, sold to certain individuals (not parties to the suit) 108 squares of ground, nearly half of the original tract of 177⅔ arpents, according to a plan on which the tract had been laid out in streets and squares, and that the two cities had received $75,284, as the price of the squares sold. Thereupon the interveners filed a supplemental petition, praying for judgment against the two cities for half of the price received by them for the 108 squares of ground sold by the cities. Judgment was rendered recognizing the interveners, as assignees of John L. Daniels to be the owners of an undivided fourth interest in the land by virtue of the sale by the city of New Orleans to Daniels, and rejecting the interest claimed by the interveners under the alleged contract with Baltimore. Accordingly, the city of Baltimore was recognized as owning ½ interest

in the land, New Orleans ¼ interest, A. T. Steele, $1/16$, A. H. Isaacson $1/24$, Mrs. Isaacson, $1/32$, Mrs. Seixas (formerly Mrs. Brenham) $1/32$, John Buckingham $1/24$, and L. N. Desharoon $1/24$. The demand of the interveners for half of the $75,284 was rejected, on the ground that such a demand could not properly be brought by intervention in a suit for partition. In the judgment, a surveyor was appointed to survey the land, and experts were appointed to appraise it and to report to the court whether it could be divided in kind, and it was ordered that the partition be made either in kind or by licitation, according to the report of the experts, and on an order of court to be thereafter obtained. The parties were referred to a notary public, named in the judgment, to effect the partition. The interveners appealed; the cities of New Orleans and Baltimore did not appeal nor pray for an amendment of the judgment, which was affirmed by this court.

The plaintiffs in the present suit allege in their petition that Mrs. Sarah Isaacson's interest (which was $1/32$) was bequeathed to her husband, A. H. Isaacson, who sold his entire interest ($1/24$ plus $1/32$, that is, $7/96$) to Jules Denis. Therefore, by reference to the judgment rendered in Baltimore v. New Orleans, the present plaintiffs allege that they own the remaining six squares of ground in these proportions: The city of Baltimore, ½; the city of New Orleans, ¼; the widow and heirs of Jules Denis, $7/96$; Mrs. Emily Daniel, widow of Charles L. Seixas, $1/32$; the succession of John Buckingham represented by C. P. Cordill, administrator, $1/24$; the succession of L. W. Desharoon, represented by C. P. Cordill, administrator, $1/24$; and Mrs. Virginia Steele, wife of Alexander Hamilton, $1/16$.

Nothing has been done by the City of New Orleans or Baltimore with regard to the six squares of ground in contest since May, 1859, when the entire tract of 177⅔ arpents was laid out in streets and squares and the 108 squares sold to certain individuals. The suit by Baltimore against New Orleans was decided nearly 21 years ago, yet the judgment of partition has never been carried out. The suit was filed on the 14th of August, 1867, and remained on the docket of the district court nearly 20 years. During that time, there was a lapse of over 4 years and another lapse of nearly 16 years in which no proceeding whatever was had in the case.

It is conceded by the plaintiffs that they do not intend to devote the property itself to a public use—that it is never to become a locus publicus. The cities of New Orleans and Baltimore intend to sell their respective interests, as they have sold their interests in the 108 squares which once formed a part of the original tract of 177⅔ arpents and as they have sold nearly all of the vast area of the McDonogh estate, and to use the proceeds for the public schools in the respective cities. This disposition of the property is not in accord with the will of John McDonogh. He stipulated that the property should never be sold by the cities of New Orleans and Baltimore; that it should be let to tenants and the revenues devoted to the five purposes stated in his will. It is permissible for the two cities to dispose of this property and devote the proceeds to the worthy cause of public education, because the law has declared that John McDonogh could not control the administration and destiny of the revenues of his estate after his death; that the many conditions under which the bequest was made were invalid—reputed not written—although the bequest itself was valid. For this same reason, from a legal point of view, may not the cities of New Orleans and Baltimore make any other disposition of the property bequeathed to them, not in accord with John McDonogh's will?

The cities of New Orleans and Baltimore advance two distinct defenses to the plea of

prescription: First, that the land in dispute is public property, because its revenues were intended to be dedicated to public uses and the proceeds of its sale are now to be devoted to one of these public uses—public education. Secondly, that the maxim, "nullum tempus occurrit regi," as embodied in our Constitution, "Prescription shall not run against the state," applies to municipal corporations.

[13] "Prescription runs against all persons, unless they are included in some exception established by law." R. C. C. art. 3521.

In view of article 193 of the Constitution of 1898 and of 1913, it is now unnecessary to consider the conflicting decisions of the courts of different jurisdictions, as to whether the maxim, "nullum tempus occurrit regi," applies to the state; nor is it now necessary to reconcile the decisions of this court rendered prior to the adoption of the Constitution of 1898, holding that the maxim did apply to this state with regard to the prescription acquirendi causa but not with regard to the prescription liberandi causa.

"Prescription shall not run against the state in any civil matter, unless otherwise provided in this Constitution, or expressly by law." Constitutions of 1898 and 1913, art. 193.

[14-18] The Constitution does not provide, nor does any statute of this state provide, that prescription shall not run against a municipal corporation. Therefore, paraphrasing article 3521, R. C. C., it logically follows that prescription runs against municipal corporations unless they are included in some exception established by law. The only exception established by law in favor of municipal corporations has reference to the status of their property or the nature of their title. Property, to the use of which all the inhabitants of a city, and even strangers, are entitled in common, such as the streets, the public walks, quays, and other public places, are not subject to private ownership; and, as prescription is one of the means of acquiring title to property, it follows that public places cannot be acquired by prescription.

"Things which belong in common to the inhabitants of cities and other places, are of two kinds:

"Common property, to the use of which all the inhabitants of a city or other place, and even strangers, are entitled in common; such as the streets, the public walks, the quays.

"And common property which, though it belongs to the corporation, is not for the common use of all the inhabitants of the place, but may be employed for their advantage by the administrators of its revenues." R. C. C. art. 458.

The above-quoted article appears in the chapter of the Code, Of the Division of Things. Turning to the chapter, Of Things Considered in their Relation to Those who Possess Them, we find:

"Things, in their relation to those who possess or enjoy them, are divided into two classes; those which are not susceptible of ownership and those which are." R. C. C. art. 481.

"Among those which are not susceptible of ownership, there are some which can never become the object of it; as things in common, of which all men have the enjoyment and use.

"There are things, on the contrary, which, though naturally susceptible of ownership, may lose this quality in consequence of their being applied to some public purpose, incompatible with private ownership; but which resume this quality as soon as they cease to be applied to that purpose; such as the high roads, streets and public places." R. C. C. art. 482.

The distinction which our Civil Code makes between that class of property owned by municipal corporations, which loses the quality of being susceptible to private ownership when applied to some public purpose, but which resumes that quality as soon as it ceases to be applied to a public purpose, and that class of property owned by municipal corporations which is not actually used by the inhabitants of the place but which may be employed for their advantage by the administrators of its revenues, is observed by Mr. Dillon, in his work on Municipal Corporations:

"Although municipal corporations are public agencies, exercising on behalf of the state public duties, yet they also exercise and acquire what the courts call rights in a private and proprietary capacity rather than in a public and gov-

ernmental capacity. Such corporations are not exempt from the operation of limitation statutes in cases wherein arise questions involving property or contracts which do not pertain to the authority of the state which is exercised through them but pertain to the private and contractual rights of the municipality, and such statutes run in favor of and against these corporations with respect to these private and proprietary rights and obligations in the same manner and to the same extent as against natural persons." Volume 3, p. 1887.

"While there is a conflict of opinion as to just how far the rule exempting the sovereign from the operation of the statute should be applied to municipal and quasi municipal corporations, the cases are generally agreed that the rule is not to be applied to such corporations to the full extent that it is applied in favor of the state.

"Thus, almost if not quite all the cases agree in holding that, where property is held by a municipal corporation as a private owner, it is subject to the operation of the statute, and title thereto may be acquired by adverse possession." 1 Cyc. 1117.

In Succession of Zebriska, 119 La. 1076, 44 South. 893, it was held by this court that property of the city of New Orleans could be acquired by prescription, even by the heir of the man who had sold it to the city. It is contended by the plaintiffs in the present case that, in the Zebriska Case, the property "was strictly the private property of the corporation, as would be a lot bought by the city at a public sale for city taxes." But, from the following expression in the opinion, it seems that this court did not so regard the property:

"We will add that the extreme probability is that the city put this property to the use for which she bought it; that is to say, took actual possession. * * * To a moral certainty the city did not at such a time acquire the property for speculation, or by way of investment, or for any indefinite future use, but for some immediate, pressing need, connected, in all probability, with her measures of defense; and, we may say the extreme probability is that she did put it to that use."

In the case of City of New Orleans v. Shakspeare et al., 39 La. Ann. 1033, 3 South. 346, the city attorney urged that the maxim, "Nullum tempus occurrit regi," should be applied to the property owned by the city, as is shown in the following quotation taken from his brief and printed in the report of the case:

"The long use of the lot as a public pound and for the public work of the city was a dedication of the lot to public purposes and rendered it nonprescriptible. The lease to Levy did not destroy its character. The public nature of the lot affected every part of it; and defendants cannot be permitted to prescribe against that part occupied by them, even though they may have occupied for more than thirty years. 2 Dil. on Mun. Corp. par. 675; Parish of Plaquemines v. Fulhouse, 30 La. Ann. 64."

But this court ignored the argument, and overruled the plea of prescription of 10 years under R. C. C. art. 853, on the ground that that particular plea does not apply to a petitory action but only to an action of boundary, and overruled the plea of prescription of 30 years on the ground that the defendants had acknowledged the title of the city during their occupancy of the land. It seems to have been recognized by the court that, although the property had been at one time used for a public purpose and was once a public place, it had lost that character when it ceased to be used for a public purpose. R. C. C. art. 482.

We have examined all the decisions cited in the original opinion in this case, and we do not find that they sustain the conclusion that this property is inalienable or exempt from prescription. Our analysis of the cases follows, viz.:

The decision in the case of Board of Liquidation v. City of New Orleans, 118 La. 715, 43 South. 307, relied upon by counsel for plaintiffs, does not shed any light upon the question whether the property in contest in the present suit is of that class of municipal property which cannot be acquired by prescription or of that class which may be so acquired. The only question at issue in the case cited was whether the city could abandon the use of the property for one public purpose and apply it to another public purpose. The court did, however, recognize that

municipal property not used for a public purpose is owned in a private capacity and that used for a public purpose is public property, and added, "The sugar sheds property is of the latter class." The only matter decided was that the city might discontinue the use of the property as sugar sheds and put it "to a use almost identical," a part of the public Belt Railroad.

In the case of State v. Board of Assessors, 52 La. Ann. 228, 26 South. 872, where this court was considering the question of exemption from taxation of the properties of various charitable institutions in this city, the distinction was recognized between property actually devoted to a charitable or pious use and property of which the revenues were devoted to such use. And it was expressly declared that the true test of the right to the exemption was the use to which the property itself was given, and not the character of the corporation owning it nor the purpose to which its revenues were dedicated.

The decision in the case of State v. Finlay, 33 La. Ann. 114, holding that a judgment creditor of the Board of Administrators of the Charity Hospital could not seize and sell the property of that state institution, the revenues of which property were being used for the support of the institution, does not deal with the question of whether the property could have been acquired by prescription if it had been lying idle.

In the case of Administrators of Tulane Educational Fund v. Board of Assessors, 38 La. Ann. 292, it was decided that:

"Property dedicated to a public use, the revenues of which serve a public purpose, is public property although the title be not in the public."

This was a suit to annul an assessment of the property for taxes; and it was held that the property came within the exemption of "all public property," granted by article 207 of the Constitution of 1879, because, said the court, "whatever taxes are payable upon this property must necessarily be paid out of these revenues that have been dedicated to a public use; that is to say, must be paid by the University." It was said with good reason that to tax property, the revenues of which have been dedicated to a public use, is the same as to tax the revenues which would have to pay the taxes, but which are public property and therefore exempt from taxation. But this manner of reasoning does not bring us to the conclusion that vacant property, the revenues of which were intended but never used for a public purpose, is public property, in the sense that public property cannot be acquired by prescription.

In the case of Mayor of Thibodaux v. Maggioli, 4 La. Ann. 73, the property in dispute was a public road or street within the corporate limits of the town of Thibodaux; hence it was well said:

"No silence or length of time could deprive the corporation or its predecessors of their powers over public places. Their inaction gave the defendant an estate at sufferance and nothing more."

In Delabigarre v. Second Municipality, 3 La. Ann. 230, the public property which was considered out of commerce was the batture donated by the riparian owners to the city for the prolongation of all the streets of the faubourg leading to the new levee. The plaintiff's suit was dismissed, however, not on the ground that the land which she claimed was public property, but because the matter in dispute had been settled by compromise. See p. 239.

In the case of Parish v. Second Municipality, 8 La. Ann. 145, the plaintiff claimed one-third of the proceeds of a sale which the municipality proposed to make of a portion of the batture, over which the plaintiff asserted a servitude. The only matter decided was that a servitude over such property in favor of an individual was against public policy.

In the case of Municipality No. 2 v. Orleans Cotton Press, 18 La. 122–278, 36 Am. Dec. 624, the only issue was whether the alluvial formation or batture belonged to the riparian proprietors along the river or to the open space left by the French government in laying out the city of New Orleans, between the front row of houses and the river, marked "quai" on the plan of the city. The case has no bearing upon the issues presented here.

In City of Baton Rouge v. Bird, Sheriff, 21 La. Ann. 246, the heirs of the man who had dedicated property to public use as a plaza sued to reclaim it, and it was said:

"After being thus set apart for public use and enjoyed as such for more than half a century, and private rights have been acquired with reference to it, the original owner or his heirs can not be permitted to deny or revoke such dedication."

In that case, the property was actually used as a locus publicus.

In the case of City of Shreveport v. Walpole, 22 La. Ann. 526, the occupant of city property contended that it was of that class of common property defined in C. C. art. 449 (R. C. C. art. 458), "which, though it belongs to the corporation, is not for the common use of all the inhabitants of the place, but may be employed for their advantage by the administrators of its revenues." 22 La. Ann. 527. It seems to have been conceded by the court that, if the property in dispute was of that class of common property, the defendant had acquired it by prescription. But the court said:

"It is of that class of property defined in the first clause of article 449 (R. C. C. 458) of the Civil Code as 'common property, to the use of which all the inhabitants of a city or other place, and even strangers, are entitled in common, such as the streets, the public walks, the quays.'"

Under this classification of the property, it was held that the defendant could not have acquired title by prescription.

In the case of Zagame v. City of New Or-

leans, 128 La. 388, 54 South. 916, the plaintiff was a trespasser upon a strip of land reserved on the government maps and dedicated for a public road, on which "a public road has existed from time immemorial, * * * probably dating back to the first settlement of the country." There is no analogy between that case and the one before us now.

In Mayor, etc., v. Magnon, 4 Mart. (O. S.) 8, the property in contest was the land lying between the levee and the river in front of New Orleans. If the converse of the proposition stated in the syllabus, "land not susceptible of alienation can not be acquired by prescription," be true, it follows that the land in contest in the present case can be acquired by prescription, because it is susceptible of alienation.

In the case of Police Jury v. Foulhouze, 30 La. Ann. 64, the land which was held to be not subject to seizure by a creditor of the parish, had been donated to the inhabitants of the parish for a courthouse site and the courthouse and jail were established on the front portion of it. It was a locus publicus, not susceptible of alienation.

The exemption of school lands, known as sixteenth sections, is not analogous to the present case. They are exempt from the plea of prescription, not because they are school lands, but because they belong to the state, and the Constitution declares that prescription shall not run against the state.

Sections 1320 and 3422, R. S., provide:

"Property dedicated to the use and belonging to public schools, or employed by municipal corporations for that purpose, shall be and is hereby exempted from seizure."

If, by implication, we may say that, notwithstanding article 3521, R. C. C., property dedicated to the use and belonging to public schools, or employed by municipal corporations for that purpose, shall be and is exempt from the plea of prescription, we must

yet face the fact that the property in dispute is not dedicated to the use of public schools nor employed by the municipal corporations for that purpose. There was no need for the Legislature to have said that property while used as a public school cannot be acquired by adverse possession or prescription.

The illustration given by Mr. Dillon, in his work on Municipal Corporations (section 1396), of the unsuccessful attempt of the city of Brooklyn to tax the public property of the city of New York used as a ferry landing in the city of Brooklyn, does not support the contention of Baltimore in the present case. As Judge Dillon said:

"On this principle, the city of Brooklyn cannot impose a tax upon land in that city owned and used by the city of New York and by its lessee as a ferry landing in connection with a ferry franchise granted by its charter to the last-named city."

The ferry landing was a public place in the city of Brooklyn; and, even though we might reason by analogy that exemption from taxation carries with it exemption from prescription, it would not require much reasoning to determine that a ferry landing cannot be acquired by adverse possession or prescription, while it is being used for such a public purpose.

To illustrate that there is very little analogy between an exemption from taxation and an exemption from prescription, let us suppose that Baltimore owned a factory on her land in New Orleans and used the revenues of the business for the public schools in Baltimore. The property would be exempt from the plea of prescription so long as it was so occupied, but it would not be exempt from taxation. It would be in the same predicament as was the standpipe or water plant owned by Kansas City, Mo., and furnishing water to the inhabitants of that city, but situated in the adjoining state of Kansas. It was not public property, or of any public benefit in the state in which it was situated;

nor did it belong to any subordinate branch of the government of the state in which it was located. It was therefore subject to taxation by the state in which it was situated. See State of Kansas ex rel. Taggart v. Holcomb, 85 Kan. 178, 116 Pac. 251, 50 L. R. A. (N. S.) 243, Ann. Cas. 1912D, 800.

The city of Baltimore, in the state of Maryland, owns property in the state of Louisiana, as a subject, not as a sovereign. The authority of the state of Louisiana to regulate the acquisition and ownership of real estate situated within her borders is not concurrent with, or shared by, the city of Baltimore or state of Maryland. A foreign municipal corporation, owning property in this state not devoted to a public use or to the benefit of the public here, is not exempt from the operation of the statutes of this state imposing restrictions upon the ownership of property of the citizens of this state.

Our conclusion is founded upon the legal principles which apply to both cities. Prescription runs against all persons not included in some exception established by law. The only exception established by law in favor of municipal corporations is that their public property is not alienable and therefore cannot be acquired by prescription. The character of municipal property and the nature of its ownership, i. e., whether of a private or public nature, whether alienable or inalienable, must be determined by the purpose to which the property is dedicated, and not by the purpose to which its revenues were intended to be dedicated or the purpose to which the proceeds of a sale of it are to be dedicated. The land in dispute is of that class of municipal property, defined in the last paragraph of article 458 of our Revised Civil Code, which, though it belongs to the corporations, is not for the common use of all the inhabitants, but may be employed for their advantage by the administrators of its revenues. It is, in the very terms of article

482 of our Revised Civil Code, alienable, subject to private ownership, and has been acquired by prescription.

For the reasons assigned, the judgment heretofore rendered by this court, in so far as it reversed or amended the judgment appealed from, is annulled and set aside; and it is now ordered, adjudged, and decreed that the judgment of the district court be and it is affirmed, at the cost of the appellants.

LAND, J., dissents and files reasons. See 66 South. 251. SOMMERVILLE, J., concurs in reasons of LAND, J.

N. B.—Soon after the original opinion and decree were rendered in this case, and before the application for rehearing was filed, the Chief Justice retired from office; the author of the opinion on rehearing succeeded to the vacancy, becoming an associate justice. The senior associate justice, who had dissented from a portion of the original opinion, became Chief Justice. The other associate justice who concurred in the opinion and decree rendered on rehearing had been absent and had taken no part in the rendition of the original opinion and decree.